Mary Lou PACK, Ann E. Watts, Robert E. Stevens and Jo E. Stevens, Husband and Wife, Appellees,

v.

SANTA FE MINERALS, A DIVISION OF SANTA FE INTERNATIONAL CORPO-RATION, Southland Royalty Company, a Delaware Corporation, and Deck Oil Company, an Oklahoma corporation, Appellants,

John V. BALZER, an individual, Jake F. Balzer and Lydia Balzer, Husband and Wife, Appellees,

v.

SANTA FE MINERALS, A DIVISION OF SANTA FE INTERNATIONAL CORPO-RATION, a Delaware corporation, Hamon Operating Company, a Texas corporation, Frontier Fuels, Inc., a Delaware corporation, Southland Royalty Company, a Delaware Corporation, and Deck Oil Company, an Oklahoma corporation, Appellants.

Nos. 74605, 74606.

Supreme Court of Oklahoma.

Feb. 22, 1994.

**324**

Gary W. Davis, Mark D. Christiansen, Crowe & Dunlevy, Oklahoma City, James R.

Fletcher, Guymon, for appellants, Santa Fe Minerals and Southland Royalty Co.

H. Wayne Cooper, Charles Greenough, Tulsa, for appellant, Deck Oil Co.

George S. Corbyn, Jr., J. Michael DeYong, Joe M. Hampton, Ryan, Corbyn & Geister, Oklahoma City, David K. Petty, Guymon, for appellees.

Eugene Kuntz, Norman, Joseph W. Morris, Gable & Gotwals, Tulsa, John S. Lowe, Dallas, TX, A.P. Murrah, Jr., Murrah & Davis, Oklahoma City, for amicus curiae.

Clifford K. Cate, Jr., Muskogee, for amicus curiae, Atlantic Richfield Co.

Rick A. Mayer, Houston, TX, for amicus curiae, Chevron U.S.A., Inc.

Gary E. Baker, Houston, TX, for amicus curiae, Exxon Corp.

James M. Peters, Gayle Freeman Cook, Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, for amicus curiae, Fina Oil and Chemical Co., Oryx Energy Co., Oxy U.S.A. Inc., Union Pacific Resources Co.

Charles L. Puckett, Houston, TX, for amicus curiae, Conoco, Inc.

Brent Alan Helms, Dallas, TX, for amicus curiae, Fina Oil and Chemical Co.

Charles E. Holmes, New Orleans, LA, for amicus curiae, Freeport–McMoRan Oil & Gas Co.

Steven R. Mackey, Cathy L. Cheney, Tulsa, for amicus curiae, Helmerich & Payne, Inc.

Hugh A. Stowe, Denver, CO, for amicus curiae, Mobil Oil Corp.

Patricia A. Moore, Dallas, TX, for amicus curiae, Oryx Energy Co.

William G. Paul, John L. Williford, Bartlesville, Joe Cochran, Susan L. Heady, Amarillo, TX, for amicus curiae, Phillips Petroleum Co.

William D. Watts, John J. Breathwit, G. Babette Patton, Andrews, Davis, Legg, Bixler, Milsten & Price, Oklahoma City, for amicus curiae, Marathon Oil Co.

David O. Cordell, Oklahoma City, for amicus curiae, Mustang Fuel Corp.

Brenton B. Moore, Tulsa, for amicus curiae, OXY U.S.A., Inc.

Randle G. Jones, Jimmy E. Shamas, Jr., Denver, CO, for amicus curiae, Texaco, Inc.

Baxter Brown, Fort Worth, TX, for amicus curiae, Union Pacific Resources Co.

SIMMS, Justice:

Appellants, Santa Fe Minerals and other oil and gas companies, (lessees) appeal the judgments entered by the district court in the quiet title actions instituted by appellees, Mary Lou Pack, Ann E. Watts, Robert E. Stevens, Jo E. Stevens, John V. Balzer, Jake F. Balzer, and Lydia Balzer (mineral rights owners/lessors). These separate actions instituted by Pack, Watts and Stevens (No. 74,605), and by the Balzers (No. 74,606) were consolidated for trial, and are consolidated for purposes of this opinion. The trial court entered judgment in favor of the mineral rights owners, canceling oil and gas leases and quieting title in the lessors.

■ The Court of Appeals affirmed, holding the leases terminated of their own terms under the provisions of the "cessation of production" clause. Certiorari was granted to consider the first impression question of whether a lease, held by a gas well which is capable of producing in paying quantities but is shut-in for a period in excess of sixty (60) days but less than one year due to a marketing decision made by the producer, expires of its own terms under the "cessation of production" clause unless shut-in royalty payments are made. We find that under such circumstances, the lease does not expire of its own terms. The opinion of the Court of Appeals is vacated, the judgment of the district court is reversed, and this cause remanded with directions to enter judgment in favor of the lessees.

The stipulated facts disclose that in both cases the mineral owners or their predecessors in interest entered into oil and gas leases with the lessees. Each of the leases contained similar provisions including a habendum clause, a shut-in or minimum royalty clause, and a 60–day cessation of production clause.

The habendum clause provides for the primary term of the lease to be for ten (10) years and "as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced." The shut-in royalty clause provides for a fifty dollar ($50.00) royalty payment per year for each well from which gas is not sold. When the royalty payment is paid, the well is deemed a producing well for purposes of the habendum clause. The cessation of production clause provides for the lease to continue after the expiration of the primary term as long as production does not cease for more than sixty (60) days without the lessee resuming operations to drill a new well.

The primary terms of each of the leases expired, and the leases continued pursuant to the habendum clause due to the wells' capability to produce in paying or commercial quantities.[1] Each of the wells continued to be capable of producing in paying quantities up until the time of trial, but lessees have chosen at times not to *market* gas from the wells for periods exceeding sixty (60) days. The lessees stipulated that they chose to overproduce the wells during the winter months when the demand for gas is higher and the price for gas increases. Because the Oklahoma Corporation Commission imposed annual allowable limitations as to how much gas may be produced from the wells, the lessees curtailed the marketing of gas from the wells during the summer months when prices were lower so as not to exceed the annual allowable limits. The intention and result of this practice was to obtain the highest price for the gas and still stay within the allowable production limits set by the Oklahoma Corporation Commission. Such a practice was common with most of the gas producers in the state.[2]

---

1. *See, infra,* Part I. A. where we discuss the longstanding rule that the term "production" as used in the habendum clause means "capable of producing in paying quantities."

2. In the public interest to prevent the waste of natural gas, the Legislature amended 52 O.S. 1981, § 29 to limit the amount of natural gas which could be produced from a well each year. *See* 1992 Sess.Laws, Ch. 14, §§ 1 and 2. Therein, the Legislature recognized that greater quan-

Although some marketing of the gas continued during the warmer months, such sales were exceeded by the monthly expenses, so the wells were not profitable during that period. Additionally, the Pack well was shut-in for one month during this period in order to build up pressure in preparation for an annual well test to determine its annual allowable limit.

The mineral owners filed suit in district court asserting the leases terminated by their own terms when the wells failed to produce for a sixty (60) day period and the lessees neither commenced drilling operations nor paid shut-in royalty payments. The trial court determined that an interruption in the sale and marketing of gas from the wells in excess of sixty (60) days constituted a cessation of production within the meaning of the cessation of production clause resulting in a termination of the leases. Judgment was entered accordingly, and the lessees/producers appealed that judgment.

## I.

**The term "produced" as used in the lease clauses means "capable of producing in paying quantities" and does not include marketing of the product.**

### A.

### The Habendum Clause

■ This Court has long held that the terms "produced" and "produced in paying quantities" have substantially the same meaning. *State ex rel. Commissioners of the Land Office v. Carter Oil Co. of West Virginia*, 336 P.2d 1086 (Okla.1958). Therein, we construed a typical habendum clause which extended the lease past its ten-year primary term as long thereafter as oil or gas is produced in paying quantities. We held that in order to extend the fixed term of ten years "and acquire a limited estate in the land covered thereby the lessee must have found oil or gas upon the premises in paying quan-

tities by completing a well thereon prior to the expiration of such fixed term." 336 P.2d at 1094. The Court then rejected the lessors' argument that production in paying quantities required the lessees to not only complete a well capable of producing in paying quantities but also remove the product from the ground and market it. Thus, where a well was completed and capable of producing in paying quantities within the primary term, the lease continued, so far as the habendum clause was concerned, as long as the well remained capable of producing in paying quantities, regardless of any marketing of the product.[3]

This rule of law has been consistently upheld. *See, e.g., Gard v. Kaiser*, 582 P.2d 1311 (Okla.1978) and *McVicker v. Horn, Robinson and Nathan*, 322 P.2d 410 (Okla.1958). Perhaps one of the best explanations for the rule was given in *McVicker* where we stated:

> "To say that *marketing* during the primary term of the lease is essential to its extension beyond said term, *unless the lease contains additional provisions indicating a contrary intent*, is to not only ignore the distinction between producing and marketing, which inheres in the nature of the oil and gas business, but it also ignores the difference between express and implied terms in lease contracts." 322 P.2d at 413 (Emphasis in original).

More recently, in *Stewart v. Amerada Hess Corp.*, 604 P.2d 854 (Okla.1979), we reaffirmed the rule that an oil and gas lease could not be terminated under the habendum clause merely because the subject well ceased producing in paying quantities. Rather, the finder of fact must also look into the circumstances surrounding the cessation, including the "[d]uration and cause of the cessation, as well as the diligence or lack of diligence exercised in the resumption of production." 604 P.2d at 858, fn. 18. In so holding we affirmed our rejection of a literal construction of the habendum clause stating:

tities of gas must be produced from the wells during the winter months due to the greater demand for natural gas for heating purposes. Thus, statutory law sanctions the gas industry's greater production during the colder months up to the established limit.

3. *See, infra,* Part II concerning the implied covenant to market.

"Under a literal or strict interpretation of the 'thereafter' provision in a habendum clause, uninterrupted production—following expiration of primary term—would be indispensable to maintain a lease in force. This would mean, of course, that *any cessation* of production [in the paying-quantities sense of the term], however slight or short, would put an end to the lease. Oklahoma has rejected that literal a view. Our law is firmly settled that the result in each case must depend upon the circumstances that surround cessation. Our view is no doubt influenced in part by the strong policy of our statutory law against forfeiture of estates. The terms of 23 O.S.1971 § 2 clearly mandate that courts avoid the effect of forfeiture by giving due consideration to compelling equitable circumstances.[4]

\*     \*     \*     \*     \*     \*

In short, the lease continues in existence so long as the interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of the circumstances involved. But under *no* circumstances will cessation of production in paying quantities *ipso facto* deprive the lessee of his extended-term estate.

A decree of lease cancellation may be rendered where the record shows that the well in suit was not producing in paying quantities and there are no compelling equitable considerations to justify continued production from the unprofitable well operations." 604 P.2d at 858 (Emphasis in original) (Citations omitted).

Finally, in *State ex rel. Comm'rs of the Land Office v. Amoco Production Co.,* 645 P.2d 468 (Okla.1982), we held:

"The provision about paying quantities adds little to the term production since it is settled that production must be in paying quantities even though a lease contains no such provision ... *It is the ability of the lease to produce that is the important factor rather than the actual production applied,* as an example of ability to produce *a shut-in gas well will hold a lease as long as the operator seeks a market with due diligence.*" 645 P.2d at 470 (Citations omitted) (Emphasis added).[5]

▇ Therefore, the lease in the case at bar cannot terminate under the terms of the habendum clause because the parties stipulated that the subject wells were at all times capable of producing in paying quantities. The habendum clause of these leases is satisfied.

### B.

### The Cessation of Production Clause

The cessation of production clause of the subject leases provides:

"If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues."

▇ The lessors/mineral interest owners argue the term "production" used in this clause includes removal and marketing of the product. They would require the lessee to continually market the gas from the well, and any cessation of such marketing for a period of sixty days or more would result in termination of the lease. We cannot accede to such a constrained construction of the clause as it discounts the intended meaning of production as this Court has determined in numerous cases, a few of which are cited above.

---

4. Title 23 O.S.1971, § 2, has not changed since its enactment in 1910. It provides:

"Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful or fraudulent breach of duty."

5. This rule has been affirmed as recently as 1990 where the majority opinion as well as the dissenters agreed that temporary cessation of production will not result in termination of an oil and gas lease. *Ludwig v. William K. Warren Foundation,* 809 P.2d 660 (Okla.1990).

In construing the provisions of a contract we are bound to consider all the provisions thereof and use each provision to help interpret the others. *Panhandle Cooperative Royalty Co. v. Cunningham,* 495 P.2d 108 (Okla.1971). Thus, our understanding of the term in the cessation of production clause is influenced by how we have interpreted it in other provisions of oil and gas leases such as the habendum clause. In *Hoyt v. Continental Oil,* 606 P.2d 560 (Okla.1980), we noted our commitment "to the principle that production means production in paying quantities in Oklahoma when the term appears in the habendum clause of an oil and gas lease." 606 P.2d at 563. We then held:

> "*After the primary term, the effect of the cessation of production clause is to modify the habendum clause and to extend or preserve the lease while the lessee resumes operations designed to restore operations.* If .the lessee fails to resume operations within the 60–day period provided in this clause neither the cessation of production clause or the habendum clause is satisfied and the lease terminates upon the expiration of the given time period."

> \*        \*        \*        \*        \*        \*

> "[W]here, as here, the *primary term has expired* and the effect of the [cessation of production] provision is to modify the habendum clause ... *there is a cessation of production if the habendum clause requires production in paying quantities and such requirement is not met.*" 606 P.2d at 563 (Emphasis added).

Therefore, the cessation of production clause serves the purpose of modifying the habendum clause to cause the lease to continue for the stated time period to give the lessee an opportunity to begin drilling a new well. The term "production" as used in the cessation of production clause must mean the same as that term means in the habendum clause. Any other conclusion would render the habendum clause useless after the primary term expires, a conclusion clearly not intended by the parties to the lease. If we were to conclude that the term "production" as used in the cessation of production clause means removal and marketing of the product as the mineral interest owners assert, then after the primary term expires, the lessee must not only keep the well in working order so that it is capable of producing in paying quantities as would be required under our well-settled understanding of the habendum clause, but gas would have to be removed and marketed in order to meet the requirements of the cessation of production clause. Any cessation of *marketing* for a sixty day period, under the lessors' interpretation of the clause, would constitute a violation of the clause resulting in termination of the lease. Such a result ignores the express terms of the habendum clause which provide for the lease to continue after the primary term as long as the well is capable of production in commercial quantities regardless of marketing.

Such a construction further disregards the express provisions of the cessation of production clause which are intended to come into play in the event that *production* from the well shall cease, i.e. the well becomes incapable of producing in paying quantities. The clause allows the lessee the opportunity to begin drilling another well on the leased premises within sixty (60) days so that production in paying quantities may be realized in another well. In other words, the lease terminates when the habendum clause is no longer satisfied, but the cessation of production clause is a saving clause which gives the lessee sixty (60) days to get the lease producing again. This is seen in *French v. Tenneco Oil Co.,* 725 P.2d 275 (Okla.1986), where we stated:

> " '[T]he provision is construed as giving the lessee a fixed period of time within which to *resume production or commence additional drilling* or reworking operations in order to avoid termination of the lease ...' Restoration of production in paying quantities within that period obviates the need to drill ..." 725 P.2d at 277 (quoting *Greer v. Salmon,* 82 N.M. 245, 479 P.2d 294 (1970) (Emphasis in original).

Thus, the clause does not require the lessee to market oil or gas actually extracted from the well. If the well was capable of production in commercial quantities at all times, but for a short period *had less than commercial quantities marketed from it,* the

lessors would require the lessees to begin drilling operations for another well that under the facts would be unnecessary and uneconomical.

Contrary to the argument of lessors and the decision of the trial court, *Hoyt v. Continental Oil, supra,* and *French v. Tenneco Oil Co.,* 725 P.2d 275 (Okla.1986), do not support termination of the lease under the cessation of production clause. In both cases, this Court affirmed termination of the lease based upon the terms of the cessation of production clause. However, we did so because at the time of expiration of the primary terms of those leases, the subject wells were *not* capable of production in paying quantities, i.e. they were not "producing" wells under either the habendum clause or the cessation of production clause. The trial court in the case at bar mistakenly concluded that "production in paying quantities" required the wells to be making a profit during the relevant months. Neither *Hoyt* nor *French* require such.

Likewise, our holding in *Hamilton v. Amwar Petroleum Co., Inc.,* 769 P.2d 146 (Okla. 1989), terminating a gas lease pursuant to the terms of the cessation of production clause does not control here. The well in *Hamilton* was capable of production in paying quantities at the time it was completed, but the evidence indicated that it was *not* capable of producing in paying quantities upon the expiration of the primary term. Unlike the wells in *Hoyt, French,* and *Hamilton,* the wells in the instant case have at all times been capable of producing in paying quantities.

In his treatise, Professor Kuntz observed that in jurisdictions such as Texas "where marketing is required as a part of production for purposes of the habendum clause," the shutting in of a gas well from which gas had been marketed could be a cessation of production under the cessation of production clause.[6] 4 Kuntz, *The Law of Oil and Gas,* § 47.3(b) at p. 106 (1990) *Id.* However, the

result is the opposite in jurisdictions such as Oklahoma that do not require marketing.

"In a jurisdiction where marketing is not required to satisfy the habendum clause and the effect of the cessation of production clause is to modify that clause, the effect of a shut-in well from which neither oil nor gas has been marketed would be the same [no cessation of production] as in a jurisdiction where marketing is required, but the reason would be different. In this instance *there would be production for purposes of the habendum clause and therefore no cessation of production. If a well is shut-in after oil or gas has been marketed, the result would be different from the result reached in a jurisdiction that requires marketing for production, for the reason that production has not ceased and the cessation of production clause is not invoked."* (Emphasis added).

■ The cessation of production clause only requires the well be capable of producing gas in paying quantities. A gas lease does not terminate under the cessation of production clause for failure to market gas from the subject wells for a sixty (60) day period. Therefore, the lease will continue as long as the well is capable of production in paying quantities subject, of course, to any violation of any other express provisions such as the shut-in royalty clause or implied covenants such as the covenant to market.

## C.

### The Shut-in Royalty Clause

As noted in Part B above, the shut-in royalty clause plays a specific role in the continuation of the lease where the well is shut-in for a period of one year. In *Gard v. Kaiser,* 582 P.2d 1311 (Okla.1978), this Court looked at the effect such a clause has where the subject gas well was shut-in for three years due to low gas pressure. Prior to being shut-in, the well was completed and

**6.** Lessors cite numerous cases which they assert support their argument that a cessation of production occurs whenever the lessee fails to remove and sell gas. We have reviewed the cases and find the majority of them come from jurisdictions which require marketing as a part of production for purposes of the habendum clause. For that reason, they carry little weight with this Court. The remaining cases are distinguishable on their facts, and we decline to discuss them in this opinion.

began production before the primary terms expired. Thus, the term of the lease was extended under the habendum clause as long as the well was capable of producing in paying quantities. However, because of low pressure, gas from the well could not enter a pipeline without additional equipment which lessee failed to install. Thus, gas was not marketed during the shut-in period. The lessors brought an action to cancel the leases on the grounds that the lessees failed to pay the shut-in royalty payments. They argued that according to the language of the lease, as soon as production ceased and the well was shut in, the lease automatically terminated.

The Court noted that in Oklahoma the shut-in royalty clause is " 'not required as an additional special limitation to extend the term' " of an oil and gas lease after a commercial discovery of gas satisfies the habendum clause. 582 P.2d at 1313 (quoting 4 Kuntz, *The Law of Oil and Gas,* § 46.3). Such a commercial discovery (capable of producing in paying quantities) extends the lease with or without the shut-in royalty clause, and the lease continues "subject to forfeiture for failure to comply with the implied obligation to market the product." *Id.*

■ We then held that "shut-in gas provisions are not to be construed as limitations or conditions which would affect termination of the leases," 582 P.2d at 1314–15. Thus, the failure to pay shut-in royalties in and of itself does not operate to cause a termination of the lease. Rather, it is the failure to comply with the implied covenant to market which results in lease cancellation.

In the situation at bar, lessors/mineral owners did not receive any royalty payments because gas was not being sold from the wells for a short period of time. The well, for all practical purposes, was shut-in for a period less than one year. Thus, if the well stayed in this shut-in state for one full year, the mineral owners would be entitled to the *minimum* shut-in royalty payment of fifty dollars ($50.00) as they agreed to be bound to in the lease. If the lessees chose to market gas from the wells, the mineral owners would receive royalty payments just as they have during the winter months. Either way, the mineral owners get paid what they are entitled to under the terms of the lease.

If we were to interpret the cessation of production clause to require marketing, then the shut-in royalty clause would be rendered meaningless. The lessees would not be able to shut-in the well and pay shut-in royalties to keep the lease viable because the cessation of production clause would mandate continuous marketing of gas. Thus, such a construction of the cessation of production clause would nullify the provisions of the shut-in royalty clause. The cessation of production clause cannot be interpreted in the manner asserted by the mineral owners.

## II.

### The Implied Covenant to Market (Doctrine of Temporary Cessation)

To this point we have held that the express provisions of the subject oil and gas leases do not require the lessees to remove and market oil or gas from the leases in order to keep the lease from terminating. However, our inquiry does not stop there for the long-standing rule is that typical oil and gas leases contain an implied covenant to market oil and gas from the subject wells. In *State ex rel. Commissioners of the Land Office v. Carter Oil Co. of West Virginia, supra,* we affirmed the rule of law set down in *Cotner v. Warren,* 330 P.2d 217 (Okla.1958) and stated:

> "In other words in the absence of a specific clause requiring marketing within the primary term fixed in the lease, the completion of a well, as provided therein, capable of producing oil or gas in paying quantities will extend such term, provided that within a reasonable time the actual length of which must of necessity depend upon the facts and circumstances of each case, a market is obtained and oil or gas is produced and sold from such well. In such event if the producing and marketing thereof in such quantities from the well so completed is continued, the lease will extend until the economic exhaustion of the product." 336 P.2d at 1095.

In *State v. Carter Oil,* the evidence showed that due diligence was exercised in the seek-

ing and obtaining of a market and, under the circumstances, such market was found within a reasonable time. Consequently, the lease was not terminated where the lessees completed the well which was capable of producing in paying quantities but were unable for over one year past the expiration date of the primary term to market the product due to not having a pipeline in the area in which to transport the product.

In *Cotner,* we adopted the rule concerning the implied covenant to market holding that the controlling factual finding is whether or not the temporary cessation of marketing was for an "unreasonable length of time." 330 P.2d at 219.[7] We concluded that five to six months of *voluntary* cessation of marketing was not unreasonable under the circumstances because the operator was attempting to work out a problem with the lessees. The facts indicated that the problem was resolved when Warren bought out the rest of the partners becoming the sole lessee and immediately attempted to enter the premises to resume operations and drill another well. The lease had not expired under the facts and circumstances presented. *Compare Hunter v. Clarkson,* 428 P.2d 210 (Okla.1967) in which this Court affirmed the trial court's cancellation of an oil and gas lease where production and marketing from the well had been voluntarily ceased by the lessee for a period of five months without any circumstances to justify the cessation.

It, therefore, follows that the lessees in the cases at bar may voluntarily cease removal and marketing of gas from the subject wells for a reasonable time "where there are equitable considerations which justify a temporary cessation." *Townsend v. Creekmore–Rooney Co.,* 332 P.2d 35, 37 (Okla. 1958). If the temporary cessation is reasonable, the lease will continue, and the burden of proving that the lessees failed to use reasonable diligence in the operation of the well squarely rests with the lessors. *Durkee v. Hazan,* 452 P.2d 803, 814 (Okla.1968); *State ex rel. Comm'rs of the Land Office v. Amoco Production Co.,* 645 P.2d 468, 470 (Okla. 1982). The lessors have failed to meet that burden. We find that under the facts and circumstances of the case at bar the lessees' temporary cessation was for a reasonable time and justified by equitable considerations.

### III.

### Conclusion

In *Rist v. Westhoma Oil Co.,* 385 P.2d 791, 792 (Okla.1963), the syllabus by the Court reads:

> "Where a cause is submitted upon an agreed statement of facts, it is the duty of this court on appeal to apply the law to such facts as a court of first instance and direct judgment accordingly."

We conclude, based upon the stipulated facts presented to us, that the leases did not terminate under the terms of the habendum clause, the cessation of production clause, or the shut-in royalty clause. Furthermore, under the circumstances of this case, the lease should not be canceled under the doctrine of temporary cessation because such temporary cessation was for a reasonable time.

For the above and foregoing reasons, the opinion of the Court of Appeals is VACATED, the judgment of the district court is REVERSED, and this cause is REMANDED with directions to enter judgment for the appellant lessees.

HODGES, C.J., LAVENDER, V.C.J., and HARGRAVE, OPALA, KAUGER, SUMMERS and WATT, JJ., concur.

ALMA WILSON, J., dissents.

---

**7.** This rule of law is often referred to as the doctrine of temporary cessation.