Herbert J. DANNE; Richard Danne; Arthur Danne; Florence Wetting; Eloise M. Flint; and William F. Lohmeyer Living Trust, Appellees,

v.

TEXACO EXPLORATION
AND PRODUCTION
INC., Appellant.

No. 81,658.

Court of Appeals of Oklahoma,
Division No. 2.

Sept. 13, 1994.

Harold Logsdon, Baker, Logsdon & Schulte, Kingfisher, for appellees.

John D. Sullivan, Denver, for appellant.

## MEMORANDUM OPINION

BOUDREAU, Presiding Judge.

Herbert J. Danne, Richard Danne, Arthur Danne, Florence Wetting, Eloise M. Flint, and William F. Lohmeyer Living Trust, Plaintiffs (lessors), brought this action to cancel oil and gas leases in section 35–17N–8W, Kingfisher County, Oklahoma, leased to Texaco, Inc., Defendant (lessee). Texaco appeals a trial court judgment in favor of all lessors terminating the leases for failure to produce in paying quantities and for failure to exercise due diligence to market the product. Four questions are presented on appeal: (1) whether a lease can expire automatically, according to its own terms, in the secondary lease term; (2) whether a lease can expire automatically for failure to pay shut-in royalties in a timely fashion; (3) whether the acceptance of shut-in royalty and royalty payments estops a lessor from asserting that a lease is terminated; and (4) whether a lessee violates the implied covenant to market by failing to produce gas for over four years from a well that is capable of production.

## FACTUAL HISTORY

The facts of this case are stipulated. The lessors own acreage that forms part of a 640-acre drilling and spacing unit, leased to Texaco. Herbert J. Danne, Richard Danne, Arthur Danne, and Florence Wetting are mineral owners of the Danne lease which was executed in 1965 without a shut-in royalty clause. William F. Lohmeyer Living Trust is the mineral owner of the Lohmeyer lease, which was executed in 1967 with a shut-in royalty clause. Eloise M. Flint is the mineral owner of the Flint lease, which was executed in 1967 with a shut-in royalty clause. The remaining one-half mineral interest in the southeast quarter of section 35 is owned by Christian, a party in a separate, but related suit against Texaco.

In 1970 the Helen Danne No. 1 well was drilled within the unit and was an oil and gas discovery. Gas produced from two formations (the Skinner and Redfork) was marketed to Oklahoma Natural Gas (ONG) through a twenty-year gas contract, executed on March 23, 1971. Casinghead gas from another formation (the Mississippi) was marketed to Phillips 66 Natural Gas (Phillips) through a contract executed on March 19, 1971. When ONG prematurely discontinued its take of gas from the Helen Danne No. 1 on April 1, 1987, Texaco shut in the well. Sale of casinghead gas to Phillips was discontinued at the time the well was shut in, but Phillips did not disconnect its casinghead gas meter until June 1989.

The well remained shut in until Texaco executed a new gas contract with Phillips on December 1, 1991; Texaco resumed production from the well on December 14, 1991. In the stipulated facts Texaco states, and the lessors do not disagree, that the well was capable of producing in paying quantities throughout the shut-in period: April 1, 1987—December 14, 1991.

Texaco asserts that its failure to produce the Helen Danne No. 1 during the shut-in

period was the result of a mistake regarding the status of its gas contract with ONG. Texaco was involved in a contractual dispute concerning production from some ninety wells with ONG, and it was not until its dispute with ONG was resolved in June 1991 that Texaco realized that the Helen Danne No. 1 gas-purchase contract had been released in December 1988. As soon as it became aware of the mistake, Texaco asserts that it began negotiations to market the product. After resolution of the Texaco–ONG dispute, and after a related case for lease cancellation, *Christian v. Texaco,* was filed on May 31, 1991, Texaco tendered shut-in royalty payments to both lessors with shut-in royalty clauses and then sought a market for the gas. Lessors Lohmeyer and Flint accepted the shut-in royalty payments and then accepted production royalty payments after the well resumed production on December 14, 1991. Texaco also tendered production royalty payments to lessor Danne, which Danne refused.

Texaco now appeals the trial court's grant of lease termination for failure to produce in paying quantities and failure to market the product. Texaco also appeals the trial court's pronouncement that Lohmeyer's and Flint's acceptance of shut-in royalties and production royalties did not have the effect of continuing the lease in full force and effect.

I

AUTOMATIC TERMINATION OF A LEASE FOR FAILURE TO SATISFY THE HABENDUM CLAUSE

■ Lessors assert, and the trial court agreed, that Texaco's lease terminated automatically, according to the terms of its habendum clause, for failure to produce gas in paying quantities. The question of automatic lease termination is significant in this action; if automatic termination can occur, no action of the lessors (even acceptance of royalty benefits) will have the effect of maintaining the lease in full force and effect. Since the facts relating to the terms of these leases are stipulated, the issue presented is one of law. The appellate court's role is to define the law; therefore, it independently reviews

questions of law. *In re Estate of Crowl,* 737 P.2d 911, 914 (Okla.1987). Contested issues of law are reviewable in all actions, suits, and proceedings by a de novo standard. *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Review of law is called "de novo," which means no deference, not necessarily a full rehearing or new factfinding. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

■ We first consider the habendum clauses in the Danne, Lohmeyer, and Flint leases. Each states: "It is agreed that this lease shall remain in force for a period of ___ years from date (herein called primary term) and *as long thereafter* as oil or gas, or either of them, is produced from said land by the lessee." (Emphasis added.) In Oklahoma, "[t]he term 'produced,' when used in a 'thereafter' provision of the habendum clause, denotes in law production in paying quantities." *Stewart v. Amerada Hess Corp.,* 604 P.2d 854, 857 (Okla.1979). *See also Pack v. Santa Fe Minerals, A Div. of Santa Fe Int'l Corp.,* 869 P.2d 323, 326 (Okla.1994) (a typical habendum clause which extends the lease past its primary term as long as oil or gas is produced is interpreted to mean "produced in paying quantities").

■ Most jurisdictions view habendum clauses using a "thereafter" provision as "conveying an interest subject to a special limitation rather than as conveying an interest subject to a condition, power of termination or right of re-entry." 3 Howard R. Williams, Oil and Gas Law § 604 (1991). In these jurisdictions, the habendum clause may be likened to a determinable estate, which automatically ends upon the happening of a condition, with no action required by the grantor. Oklahoma does not, however, take the view that habendum clauses are special limitations; rather, Oklahoma views the habendum clause as an estate on condition subsequent creating only a right of entry in the grantor. With such an estate, the grantor must bring an action to cause forfeiture of the estate. For example, in *Stewart,* the court held that "[t]he occurrence of the limiting event or condition *does not automatically effect an end to the right." Stewart,* 604 P.2d

at 858 (emphasis added). The court further commented that:

> Our law is firmly settled that the result in each case [with regard to cessation of production] must depend upon the circumstances that surround cessation. Our view is no doubt influenced in part by the strong policy of our statutory law against forfeiture of estates. The terms of 23 O.S.1971 § 2 clearly mandate that courts avoid the effect of forfeiture by giving due consideration to compelling equitable circumstances.

*Id.* This view was confirmed in a recent decision where mineral owners brought an action to cancel a lease for failure to produce in paying quantities during a temporary shut in of gas. The court held that "under *no* circumstances will cessation of production in paying quantities *ipso facto* deprive the lessee of his extended-term estate." *Pack,* 869 P.2d at 327 (quoting *Stewart,* 604 P.2d at 858) (emphasis original).

The view of the supreme court in *Pack* is fully consistent with previous Oklahoma law regarding habendum clauses, but may appear confusing because Oklahoma has also recognized automatic termination of oil and gas leases in some circumstances. However, an examination of the cases indicates that, for the purposes of lease termination, Oklahoma makes a distinction between clauses of the primary term and clauses of the secondary term of the lease *See Duer v. Hoover & Bracken Energies, Inc.,* 753 P.2d 395, 398 (Okla.Ct.App.1986) ("In Oklahoma it is settled that, absent third party error, a lease will automatically terminate by its own terms due to lessee's failure to pay delay rental payments [in the primary term]."); *Petroleum Eng'rs Producing Corp. v. White,* 350 P.2d 601, 604 (Okla.1960) ("It is settled law that such a lease [in the primary term] terminates without affirmative action on the part of lessor upon lessee failing to either commence a well or pay delay rentals within the period provided by the lease." (citations omitted)); *Ellison v. Skelly Oil Co.,* 206 Okla. 496, 244 P.2d 832, 835 (1951) ("[I]t is expressly held that the effect [of failure to pay delay rentals] is not truly a forfeiture but is a

termination of the lease in accordance with the agreement of the parties.").

In the primary term, before hydrocarbons are discovered, the lessee has the right to explore for a fixed period of time. If he fails to discover hydrocarbons within the enumerated period, he must either buy more time (through payment of something like a delay rental) or lose the lease when the term has expired. When the time runs out on the primary term, the estate is not forfeited, it simply ceases to exist by its own terms, a simple terminable estate. Automatic termination of the lease at this stage of exploration does not divest the lessee of valuable assets, since no assets have yet been proved. *See Duer,* 753 P.2d at 398; *Petroleum Eng'rs,* 350 P.2d at 604; *Ellison,* 244 P.2d at 835.

Occurrences of limiting conditions in the secondary lease term are treated differently. The habendum clause enumerates the conditions of continuation of the lease from the primary fixed term into a secondary term of indefinite duration. It directs continuation of the lease so long as production is maintained for the mutual benefit of the lessee and lessor. No automatic termination of the lessee's estate can be tolerated at this stage in the life of the lease, because the lessee has proved a valuable asset and has established a right to develop that asset. The interest the lessee has, after drilling and proving hydrocarbons, can be likened to a vested estate, the loss of which can only be effected through an action for forfeiture. Consequently, at law, the lessee in the secondary term must be given a reasonable opportunity to develop the asset without unreasonable fear of forfeiture.

Therefore, in the case at bar, since production from the Helen Danne No. 1 well has moved the lease into its secondary term, we hold that Texaco's lease can not be terminated automatically.

## II

### AUTOMATIC TERMINATION OF LEASE FOR FAILURE TO MAKE TIMELY PAYMENT OF SHUT-IN ROYALTIES

Texaco tendered shut-in royalties to lessors Lohmeyer and Flint four years after the

Helen Danne No. 1 well was shut in. The terms of their leases require that shut-in royalties be paid annually to the lessors when a producing well is shut in. The relevant portions of the leases state:

> During any period (whether before or after expiration of the primary term hereof) when gas is not being so sold or used and the well or wells are shut in and there is no current production of oil or operations on said leased premises sufficient to keep this lease in force, lessee shall pay or tender a royalty of One Dollar ($1.00) per year per net royalty acre retained hereunder, *such payment or tender to be made, on or before the anniversary date of this lease next ensuing after the expiration of ninety (90) days from the date such well is shut in and thereafter on the anniversary date of this lease during the period such well is shut in,* or to the royalty owners or the royalty owner's credit in the rental depository bank hereinafter designated. When such payment or tender is made it will be considered that gas is being produced within the meaning of the entire lease. (Emphasis added.)

▇▇ By tendering payments four years after the well was shut in, Texaco failed to make timely payment of the shut-in royalties as directed by the terms of the lease. Lessors cite a recent Oklahoma Court of Appeals, Division 3, case as a similar fact situation where the court of appeals affirmed a trial court grant of judgment, in part, on the grounds that "the lease expired under its own terms for failure to pay shut-in royalties in the manner provided by the lease." *Christian v. Texaco,* Appeal No. 79,590 (Okla.Ct.App., June 22, 1993, unpublished opinion). To the extent that lessors rely on *Christian* for the proposition that failure to pay shut-in royalties results in automatic lease termination, we believe they are misguided. Unless a lease clearly provides for forfeiture of the lessee's estate upon failure to make timely payment, the lessor's grounds for relief lay only in contract law. *See Cannon v. Cassidy,* 542 P.2d 514, 516 (Okla.1975) (quoting *Wagoner Oil & Gas, Co. v. Marlow,* 137 Okla. 116, 278 P. 294, 306 (1929)) (quoting *Thornton on Oil and Gas,* p. 587 (1925)) ("A failure to pay royalty under the lease will

not give the lessors sufficient grounds to declare a forfeiture 'unless by the express terms of the lease they are given that right and power.' "). Similarly, in a case where a lessee failed to pay shut-in royalties promptly the court held that "failure to pay shut-in royalties in and of itself does not operate to cause a termination of the lease." *Pack,* 869 P.2d at 330. We therefore hold that Texaco's failure to timely tender shut-in royalties does not cause automatic forfeiture of Texaco's lease, because the Lohmeyer and Flint leases do not expressly state that such forfeiture is mandated.

### III

### ESTOPPEL BY ACCEPTANCE OF BENEFITS

It has been held in Oklahoma that acceptance of royalties does not estop the lessor from asserting lease cancellation, if the lease has already automatically expired, by its own terms, prior to acceptance of royalties. *Woodruff v. Brady,* 181 Okla. 105, 72 P.2d 709, 711–12 (1937). "[I]f a lessee should continue to make royalty payments to the lessor after the lease has terminated according to its own terms, the receipt of such payments will not work an estoppel against the lessor, and such lessor may nevertheless assert that the lease has terminated." 3 E. Kuntz, Oil and Gas § 43.2 (1989).

▇▇ When a lease does not expire automatically, however, the lessor's acceptance of benefits may estop the lessor from asserting lease termination. Even in a case where an express covenant to drill wells was breached by the lessee, the lessor has been estopped from asserting termination of the lease on grounds of acceptance of royalties from lessee. *Anderson v. Talley,* 199 Okla. 491, 187 P.2d 206 (1947). The court ruled that "[b]y the receipt of the [royalty] payments, the lessor clearly and definitely recognized the existence of the lease long after the breach. We conclude the lessor waived the breach of the lease which the lessees had committed and that plaintiff is not entitled to cancellation of the lease therefor." *Id.* 187 P.2d at 208.

Similarly, the court has held that it is "[a] long recognized rule ... that acquiescence in a lease and acceptance of royalty constitutes waiver of any objection the lessor could have taken regarding alteration and estops the lessor from denying the lessee's title." *Durkee v. Hazan*, 452 P.2d 803, 812 (Okla.1968). *See also Mullins v. Ward*, 712 P.2d 55, 62 (Okla.1985) (mere acceptance of shut-in royalty, "after the expiration of the primary term, can estop a lessor from denying lessee's title"); *Gazin v. Pan Am. Petroleum Corp.*, 367 P.2d 1010, 1011–12 (Okla.1962) ("it is clear that the lessors may waive their right to demand production or marketing of the product by accepting delay rentals"); *Scott v. Signal Oil Co.*, 35 Okla. 172, 128 P. 694, 695 (1912) (plaintiff is estopped from denying the validity of a lease assignment, made in violation of the terms of the lease, by subsequent acceptance of benefits under the terms of the lease); *Eagle Oil Co. v. Sinclair Prairie Oil Co.*, 24 F.Supp. 612, 618 (N.D.Okla.1938), *aff'd*, 105 F.2d 710 (10th Cir.1939) ("The acceptance of royalties ... after the term of the ... lease had expired ... was an affirmation of the plain intent of the foregoing contracts....").

■ It is undisputed that Texaco tendered and lessors, Lohmeyer and Flint, accepted shut-in royalties dated June 3, 1991 (for the period April 14, 1989, to April 13, 1992) and also accepted shut-in royalties dated February 21, 1992 (for annual shut-in royalties dated April 18, 1992). Lohmeyer and Flint also accepted monthly production royalty checks from Texaco from February 24, 1992, to January 23, 1993. Since these leases were held by production in the secondary term, these leases could not expire automatically by their terms; rather, they could only terminate through an action against Texaco. However, before bringing such action, Lohmeyer and Flint accepted the bene-

fits of shut-in royalties tendered expressly for the purpose of continuing the lease in the absence of production. Lohmeyer and Flint also accepted production royalties both before and after this law suit was filed. We find that the conduct of Lohmeyer and Flint affirmed the existence of their leases with Texaco and that they are now estopped from denying Texaco's claim of title. We, therefore, reverse the trial court's grant of lease cancellation to Lohmeyer and Flint.

## IV

## TERMINATION OF THE LEASE FOR FAILURE TO PRODUCE IN PAYING QUANTITIES AND BREACH OF IMPLIED COVENANT TO MARKET

■ Since lessor Danne did not accept benefits in the form of royalties from Texaco after the Helen Danne No. 1 well was shut-in, Danne is not estopped from asserting cancellation of the lease for failure to produce in paying quantities or for failure to exercise due diligence to market the product.[1] It is, therefore, necessary to further consider these issues.

■ Though we have held that a lease cannot terminate automatically in the secondary term of the lease, this holding should not be construed to imply that failure to satisfy the terms of the habendum clause can never result in forfeiture of the lease. Rather, such forfeiture can result if an action is brought and it is demonstrated that the lessee either failed to produce in paying quantities or failed to market the product with due diligence in breach of the implied covenant to market the product.

■ In the case at bar, lessors contend that the Helen Danne No. 1 well's capability of producing in paying quantities cannot sat-

---

1. Lessee also asserts in its brief that lessors should be barred from bringing this action by laches. Lessee suggests that the lapse of over four years from the time of the shut in and the time of bringing suit is an inexcusable delay and causes them harm. We do not agree. The lapse of time and any injuries caused by it are the result of Texaco's own failure, through mistake or otherwise, to attend to their duties as operator. Texaco cannot claim that its failure over the four years was harmless and, at the same time, that the lessor's failure to bring suit was harmful. "Application of the doctrine of laches depends on the equities of the case, and not merely the lapse of time ... any prejudice suffered by the defendant was the result of its own action and not as a result of Lessor's 'delay' in instituting suit. He who seeks equity must do equity." *Duer*, 753 P.2d at 399.

isfy the terms of a "thereafter" habendum clause. This issue has been previously considered in Oklahoma in a case where a discovery was made in the primary term of the lease, but a market had not yet been found for the product before expiration of the primary term. *McVicker v. Horn, Robinson & Nathan*, 322 P.2d 410 (Okla.1958). The court in *McVicker* held that with the exercise of due diligence, capability to produce could hold the lease into the secondary term within the meaning of production in the habendum clause. *Id.* The court, however, limited this holding by stating that "[o]il and gas lessees should not be allowed to hold their leases indefinitely, while no product therefrom is being marketed and diligent efforts are not being made to accomplish this." *Id.* at 416. Similarly, it has been held that:

> "[I]n the absence of a specific clause requiring marketing within the primary term fixed in the lease, the completion of a well, as provided therein, *capable of producing oil or gas in paying quantities will extend such term*, provided that within a reasonable time the actual length of which must of necessity depend upon the facts and circumstances of each case, a market is obtained and oil or gas is produced and sold from such well." (Emphasis added.)

*State ex rel. Comm'rs of the Land Office v. Carter Oil Co. of West Virginia*, 336 P.2d 1086, 1095 (Okla.1958) (emphasis added).

▄▄▄ Most persuasively, in a fact situation nearly identical to the case at bar, where the lessors attempted a lease cancellation because a well that was capable of production had been shut in, the supreme court clarified that capability of production satisfies the terms of the habendum clause. *James Energy Co. v. HCG Energy Corp.*, 847 P.2d 333, 339 (Okla.1992). The plaintiffs admitted that the well was capable of producing in paying quantities. Therefore, the court held that the leases were held by production and did not expire by their own terms. *Id.* We, therefore, hold that a well that is capable of production in the secondary term of the lease can satisfy the requirement of "production" in a "thereafter" habendum clause, subject to satisfaction of other covenants in the lease.

▄▄▄ Capability of production alone, however, without a significant attempt to market the product, will not suffice to hold the lease because there is a covenant to market the product with due diligence implied in each oil and gas lease. *See Pack*, 869 P.2d at 330 ("typical oil and gas leases contain an implied covenant to market oil and gas from the subject wells"). The efforts to secure a market for production must be assessed according to the facts and circumstances of each case. *See Flag Oil Corp. of Delaware v. King Resources Co.*, 494 P.2d 322, 325 (Okla.1972) ("[I]n the absence of ... an express requirement [to market the product], the lessee's duty to market is based on an implied covenant.... [T]he diligence of the lessee's efforts, and the reasonable probability of their [*sic*] success, are factors to be taken into consideration in determining what constitutes a 'reasonable time' under this rule.") An action for lease cancellation, brought for failure to market the product with due diligence, is an action of equitable cognizance, and we will affirm the judgment of the trial court unless it is clearly against the weight of the evidence. *Barby v. Singer*, 648 P.2d 14, 17 (Okla.1982).

Texaco operates a well that is capable of production, but was shut in for over four years. Texaco asserts that the well was shut in by mistake, but acknowledges that during the first two years of shut in, Phillips had a gas meter at the well and could have taken the gas at spot-market prices. Under these facts and circumstances, the trial court took the view that Texaco failed to exercise due diligence to market the product to a readily-available gas purchaser. The trial court's view is neither inconsistent with the facts presented, nor unsupported by previous decisions.

In *Hunter v. Clarkson*, 428 P.2d 210 (Okla. 1967), the trial court terminated a lease. The supreme court held that "[t]he cessation [of production] was voluntary and there appears to be no circumstances justifying the trial court's continuation of the lease." *Id.* at 212. The court further stated that "[t]he operator cannot ... only produce oil when it suits his purposes. The landowner has an interest which must, and will, be protected

when the operator ceases production *for an unreasonable time,* without cause, after the expiration of the primary term." *Id.* at 213 (emphasis original). Absent any clear evidence undermining the trial court's view that Texaco lacked sufficient cause to justify the shut in, and absent circumstances estopping the claim of lease cancellation (such as affect lessors Lohmeyer and Flint), the trial court's view that this lease is terminated for failure to market the product with due diligence must be upheld. We therefore affirm the trial court's grant of lease cancellation to lessor Danne.

## CONCLUSION

In summary, we hold that a lease cannot terminate automatically for lessee's failure to produce in paying quantities within the meaning of the habendum clause or to make timely payment of shut-in royalties. In the secondary term of the lease, when the lease is capable of production, an action for lease termination must be brought in order to cause forfeiture of the lessee's estate. Because Lohmeyer and Flint accepted benefits from Texaco before bringing such action, they are now estopped from denying Texaco's title. We, therefore, reverse the trial court's grant of lease termination to Lohmeyer and Flint. Danne, however, has accepted no benefits from Texaco since bringing this action and is thus not estopped from denying Texaco's title.

Though we hold that, in the secondary term, a well that is capable of production can hold the lease within the meaning of the habendum clause, we find that the weight of evidence supports the trial court's holding that Texaco failed to act with due diligence to market the product. We therefore affirm the trial court's grant of lease cancellation to Danne on grounds that Texaco forfeited the lease for breach of the implied covenant to market.

AFFIRMED IN PART, REVERSED IN PART.

REIF, C.J., and RAPP, J., concur.