2010 Ark. App. 422

**L & L ENERGY COMPANY, Lindell and Letha Sharp, Individually, Appellants**

v.

**CHESAPEAKE EXPLORATION, LLC, Appellee.**

No. CA 09–1263.

Court of Appeals of Arkansas.

May 12, 2010.

Matthew C. Carter, Warner, Smith & Harris, PLC, Rogers, for appellants.

David F. Butler, Jr., Crave & Butler, P.A., Magnolia, Erik P. Danielson, Booneville, for appellees.

DAVID M. GLOVER, Judge.

This is an action for cancellation of oil and gas leases and for quiet title by appellee, Chesapeake Exploration, LLC (Chesapeake), against appellants L & L Energy Company and Lindell and Letha Sharp, individually (collectively "Sharp"). In Chesapeake's original petition filed November 26, 2007, several other persons and entities were also originally named as defendants, but were subsequently dismissed from the lawsuit and play no part in this appeal. An amended petition was filed on August 22, 2008. Following the hearing on May 7, 2009, the trial court issued its

letter opinion on June 19, 2009, and a judgment in favor of Chesapeake was entered on July 30, 2009. We affirm.

### Standard of Review

 The standard of review on appeal from a bench trial is whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Pianalto* |₂*v. Pianalto,* 2010 Ark. App. 80, 374 S.W.3d 67. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, when considering all of the evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* Disputed facts and determinations of credibility are within the province of the fact-finder. *Jaramillo v. Adams,* 100 Ark.App. 335, 268 S.W.3d 351 (2007). A trial court's conclusions of law, however, are given no deference on appeal. *Id.*

### The Hearing

At the hearing, the parties introduced as a joint exhibit certain stipulated facts, which included the following pertinent lease provisions:

#### 1) Habendum Clause

Subject to the other provisions herein contained, this lease shall remain in force for a term of ——*—— years from this date (herein called "primary term"), and as long thereafter as oil and gas, or either of them, is produced from the above described land or drilling operations are continuously prosecuted as hereinafter provided. "Drilling operations" includes operations for the drilling of a new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-establish production of oil or gas; and drilling operations shall be considered to be "continuously prosecuted" if not more than 60 days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on another well or hole. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the above described land but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted; and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced. If, after the expiration of the primary term of this lease, production from the above described land should cease, this lease shall not terminate if lessee is then prosecuting drilling operations, or within 60 days after each such cessation of production commences drilling operations, and this lease shall remain in force so long as such operations are continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the above described land.

|₃*Some leases specify a 3–year primary term, and some specify a 5–year term.*

#### 2) Shut–In Royalty Clause

If a well capable of producing gas or gas and gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut in well shall be deemed to be a well on the leased

premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas and gas-condensate capable of being produced from such shut in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut in, as royalty, an amount equal to $1.00 per net acre for the acreage covered by this lease as to which the leasehold rights are, at the end of such annual period, owned by the lessee making such payment. . . . [Ellipsis in original.]

### 3) Force Majeure Clause

All express provisions and implied covenants of this lease shall be subject to all applicable laws, governmental orders, rules and regulations. This lease shall not be terminated in whole or in part, nor lessee held liable in damages, because of a temporary cessation of production or of drilling operations due to breakdown of equipment or due to the repairing of a well or wells, or because of failure to comply with any of the express provisions or implied covenants of this lease if such failure is the result of the exercise of governmental authority, war, armed hostilities, lack of market, act of God, strike, civil disturbance, fire, explosion, flood or any other cause reasonably beyond the control of lessee.

The stipulation also included the following facts. Robert Grubbs, appellants' predecessor in interest, drilled and completed a natural gas well in October 1995, which produced gas in paying quantities prior to the expiration of the primary term of the applicable leases. Appellant Lindell Sharp purchased the gas well and associated leases owned by Grubbs as part of Robert Grubbs's Chapter 7 Bankruptcy action. The assignment of the oil and gas leases to Lindell Sharp was executed on June 1, 2000, and, effective February 13, 2002, Lindell assigned the leases and the gas well to his company, appellant L & L Energy Company. There was no production from the gas well between May 2000 and November 2000. The pipeline that was used to market the gas well was conveyed from Grubbs to L & L Energy Company by quitclaim deed dated February 18, 2005. In November 2008, the gas well was recompleted and renamed. Finally, the stipulation included production records for the original gas well and the recompleted gas well, including a record of the payment of production and shut-in royalties to lessors under the leases.

Though several witnesses testified at the hearing, it is only necessary to briefly highlight their pertinent testimony because, in large part, the testimony supplements the above joint stipulations. Lindell Sharp testified concerning the background of his acquisition of the gas well and pipeline from Grubbs, production from the well, shutting the well, and payment of royalties. Jim Kelly, a land man with Chesapeake, testified concerning his opinion that the leases had expired by their own terms because the gas well not only had not produced, but was not capable of producing. Mills Bale, a production engineer with Chesapeake, testified that it was his opinion the gas well was not capable of producing in paying quantities. Robert Grubbs testified by deposition about his

bankruptcy and the sale of the well; he stated that in his opinion, the gas well had potential but that it had a lot of problems. Mike Webb, president of Webb Energy Resources, Inc., testified that his firm marketed the gas from the well for Sharp and that he made shut-in royalty payments when requested by Sharp and as shown on the exhibit recording those payments. Finally, Lindell Sharp testified again, stating his opinion that the well was capable of production and that none of the lessors had contacted him prior to the lawsuit to say that the leases were terminated or that they were upset with his handling of the property.

*The Ruling*

After hearing evidence in this case, the trial court made the following findings of fact and conclusions of law:

a) In March 2000, Robert Grubbs filed for Chapter 7 Bankruptcy protection. Separate defendant, Lindell Sharp purchased the Holliman 1–28 well located in Section 28, Township 9 North, Range 7 West, White County, Arkansas ("Holliman 1–28") and the leases owned by Robert Grubbs, Grubbs Energy Company, and/or GEC Investments, LLC as authorized by the U.S. Bankruptcy Trustee, Thomas E. Robertson, Jr. The assignment of oil and gas leases to Lindell (a/k/a Lyndall) Sharp was executed June 1, 2000. Subsequently, Lindell Sharp assigned the leases and the Holliman No. 1 to his company, separate defendant, L & L Energy Company, by assignment, conveyance and bill of sale, effective February 13, 2002. These leases were all located in Section 28, Township 9 North, Range 7 West, White County, Arkansas as follows:

. . . .

b) The primary term of each of the leases has expired.

c) The Holliman 1–28 is the only completed oil or gas well located in Section 28, Township 9 North Range 7 West, White County, Arkansas.

d) Production from the Holliman 1–28 ceased in May 2000.

e) In May of 2000, the Holliman 1–28 was not capable of production in commercial quantities.

f) Drilling operations were not commenced within 60 days from the cessation of production from the Holliman 1–28 in May of 2000.

g) There was no production from the Holliman 1–28 between May 1, 2000, and November 30, 2000.

h) Drilling operations were not commenced within 60 days from the expiration dates of the primary terms of any of the leases.

i) Some of the plaintiffs accepted royalty payments from [Sharp] after the expiration of the primary term of the leases. The acceptance of royalties did not estop the plaintiffs from asserting lease cancellations because the leases had already automatically expired by their own terms, prior to acceptance of royalties.

j) In order for [Sharp] to pay shut-in royalties, the Holliman 1–28 well had to be capable of producing commercial quantities of gas at the time it was shut-in. It was not capable of producing gas in commercial quantities at that time.

k) In this case, the subject leases expired under their own terms because there was no actual production at the expiration of each lease's primary term and defendants failed to comply with the contractual substitutions for

production or the "Shut-in Royalty Clause."

l) The leases in question are also deemed cancelled because [Sharp] breached the implied covenant of reasonable development.

m) The oil and gas leases of the [Sharps] have expired.

### Discussion

In this appeal, Sharp contends that the trial court erred in failing to apply the equitable principles of waiver and estoppel to bar the lease cancellation claims of certain mineral owners who had ratified the oil and gas lease, had accepted royalties and surface damages, and had allowed drilling operations on the leasehold, without objection. We address only the portion of this argument that focuses on the trial court's refusal to apply estoppel based upon the acceptance of royalties by mineral owners because, as demonstrated by the earlier recitation of the findings of fact and conclusions of law, the trial court did not make any rulings concerning ratification of the oil and gas leases, the payment of surface damages, or the allowance of drilling operations on the leasehold without objection. Consequently, even though Sharp presented these other arguments to the trial court, in the absence of a ruling by the trial court, those arguments are not properly before us.

In its judgment, the trial court found that "the subject leases expired under their own terms because there was no actual production at the expiration of each lease's primary term and Sharp failed to comply with the contractual substitutions for production or the 'Shut-in Royalty Clause.'" Sharp does not challenge this finding by the trial court. Based upon this finding, the trial court concluded that the acceptance of royalty payments from Sharp after the expiration of the primary term of the leases did not estop the lessors from asserting lease cancellations. Sharp *does* challenge this conclusion by the trial court.

The parties acknowledge that there is not an Arkansas case that specifically addresses equitable estoppel in a "royalty payment" context, as is presented here, and we have not found one either. However, in 3 SUMMERS ON OIL AND GAS, § 19:8 (3d ed.2008), the authors explain:

Where a lease is made for a definite term of years, the acceptance of royalty payments by the lessor after the expiration of that term may estop him to deny the existence of the lease. *Where, however, the duration of a lease is for a definite primary term and as long thereafter as oil or gas is produced from the premises in paying quantities, acceptance of royalty payments by the lessor after the expiration of the primary term does not estop her to assert termination of the lease for failure of production as of the end of the primary term or thereafter.*

(Emphasis added.) In the present case, the terms of the leases fall in the second category (emphasized), and therefore the trial court's refusal to apply the doctrine of estoppel is in line with generally accepted oil and gas principles. Moreover, in *Ladd Petroleum Corp. v. Eagle Oil & Gas Co.*, 695 S.W.2d 99, 109 (Tex.App.1985), the Texas Court of Appeals explained, in the context of issues that might occur on remand:

We reject Ladd's estoppel argument in regards to the acceptance of royalties. Assuming the leases terminated because of cessation of production, the mere continuance of the acceptance of royalties would not estop the Blair lessors from challenging the lease. There must have been some affirmative act or concealment on the part of the lessors, as well

as reasonable reliance by Ladd. Here, the Blair lessors made no such affirmative act.

 *Furthermore, once a lease terminates by its own terms, it cannot be ratified or revived.* (Emphasis added and citations omitted.) And, in *Danne v. Texaco Exploration & Production, Inc.,* 883 P.2d 210, 215 (Okla.App.1994), the Oklahoma Court of Appeals explained:

> It has been held in Oklahoma that acceptance of royalties does not estop the lessor from asserting lease cancellation, *if the lease has already automatically expired, by its own terms, prior to acceptance of royalties.* "[I]f a lessee should continue to make royalty payments to the lessor after the lease has terminated according to its own terms, the receipt of such payments will not work an estoppel against the lessor, and such lessor may nevertheless assert that the lease has terminated."

(Emphasis added and citations omitted.) As these cases from other jurisdictions make clear, it is the automatic expiration of the lease, by its own terms, prior to the acceptance of royalties that prevents the application of the principles of estoppel.

Here, again, the trial court specifically found that "the subject leases expired under their own terms because there was no actual production at the expiration of each lease's primary term and Sharp failed to comply with the contractual substitutions for production or ₉the 'Shut-in Royalty Clause,' " and that the royalty payments from Sharp were accepted by the lessors *after* the leases had already automatically expired by their own terms. It was on that basis that the trial court refused to apply the principles of estoppel in this case. We hold that under the circumstances of this case, the trial court was correct in doing so, and we, therefore, affirm.

Affirmed.

VAUGHT, C.J., and GRUBER, J., agree.