2004 OK 10

**Max SMITH, d/b/a Smith Oil, Appellant,**

v.

**MARSHALL OIL CORPORATION, Appellee.**

**No. 96,987.**

Supreme Court of Oklahoma.

Feb. 10, 2004.

---

Jack Mattingly, Sr., Jack Mattingly, Jr., Gary P. Snow, Mattingly, Snow & Mattingly, P.C., Seminole, OK, for Appellant.

James W. George, L. Mark Walker, Crowe & Dunlevy, A Professional Corporation, Oklahoma City, OK, for Appellee.[1]

WINCHESTER, J.

¶1 The dispositive issues on certiorari are whether the subject leases terminated under the terms of their habendum clauses, and whether ownership of certain equipment left on the leased premises by appellant, Max Smith, d/b/a Smith Oil, vested in the surface owner. We answer these questions in the affirmative.

## FACTS AND PROCEDURAL HISTORY

¶2 The operator, Max Smith d/b/a Smith Oil, acquired oil and gas leases for properties located in Seminole County, Oklahoma.[2] The relevant leases provide for a one-year primary term. It is undisputed that Smith obtained production from the Stacy and Paige wells during the primary term and that the leases were held by production into their secondary terms. The leases contain habendum clauses that provide for secondary terms "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." An addendum to the lease dated November 30, 1987, to-wit: Paragraph 7 of

Exhibit "A" to said lease between J.W. Scott and Alyce Scott, lessors, and Max Smith d/b/a Smith Oil, lessee, provides the following:

"7. In the event of cessation of production on said loud [land], Lessee agrees to remove all salvageable structures he then owns within six (6) months of cessation date, weather permitting. Failure of Lessee to do so shall vest ownership of said equipment to the surface owner."

¶3 The trial court rendered judgment against Smith in a quiet title action brought against Marshall Oil Corporation, appellee herein and a successor in interest to Smith. The trial court held that the oil and gas leases expired under the terms of their habendum clauses, and thus were no longer in force. The trial court also held that ownership of the structures and equipment Smith placed on the leased premises vested in the surface owner under ¶7 of the Exhibit "A" addendum quoted hereinabove. The Court of Civil Appeals, Division I, in an opinion released for publication, affirmed the judgment of the trial court. We granted certiorari.

¶4 Appellant Smith acquired a working interest in the oil and gas leasehold estate known as the Stacy–Paige lease pursuant to the above-mentioned leases covering the south half of the northeast quarter of section 22, township 10 north, range 7 east, in Seminole County, Oklahoma. Smith acquired the prior leasehold estate by sheriff's deed dated November 17, 1988, and filed December 9, 1993.[3] It is undisputed that Smith obtained production on Stacy–Paige lease during the primary term. It also is undisputed that this production continued in commercial quanti-

---

1. Identified herein are only those counsel for the parties whose names appear on the certiorari briefs.

2. The record reflects the following leases: November 12, 1987, lease with Scott as lessor and Goodnight as lessee (Exh. 1); November 30, 1987, lease with Scott as lessor and Smith as lessee (Exh. 2, that contains the Exhibit "A" attachment with the provision to remove structures or forfeit same, within six months of cessation of production); November 12, 1987, lease with Ratliff as lessor and Goodnight as lessee (Exh. 3); November 30, 1987, lease with Scott as

lessor and Smith as lessee (Exh. 4); October 10, 1988, assignment of oil and gas leases, with Westoil Properties, Inc., assignor and Max Smith d/b/a Smith Oil, assignee (covering the Stacy and Paige lease in Seminole County, as well as the Brett lease that is not relevant to the instant matter)(Exh. 5); April 16, 1988, assignment of Overriding Royalty Interest with Max Smith d/b/a Smith Oil as assignor and Scott as assignee (covering the Stacy #1–22 and Paige #1–22 wells.)

3. See Plaintiff's exh. 12 and Defendant's exh. 1.

ties for several years into the secondary term. However, the parties disagree as to whether or not the subject wells were at all times capable of producing· in paying quantities during the secondary term. Indeed, this was a factual issue before the trial court.

¶ 5 Marshall Oil's predecessors, West Consulting Company, Inc. and Energy Lease Brokers, Inc., purchased new oil and gas leases that covered the same properties as Smith's old leases on October 26, 1998, January 21, 1999, and April 8, 1999. They entered the premises and took possession of the Stacy and Paige wells. In February 2000, they top-leased the properties to Marshall Oil.[4] Marshall Oil is successor in title to the rights in the top leases, pursuant to an Assignment dated February 10, 2000, but with the effective date of November 1, 1999. No party argues that the top leases grant a reversionary interest independent of the adjudication of the base leases.

¶ 6 It is undisputed that the mineral owner lessor never made a verbal or written demand on Smith to comply with the implied covenant to market oil or gas from the wells, and did not give Smith reasonable time to comply with any such demand. It also is undisputed that the mineral owner lessor never brought an action to declare a forfeiture of the lease. Smith contends that the instant action arises from a claim of breach of the implied duty to market oil and gas. As such, he reasons that a demand must be made, and time granted with which to comply, prior to commencement of an action against him. Marshall Oil argues that the quiet title action before us is premised upon the theory that the Stacy–Paige lease expired under the terms contained in the habendum clause, and as such, no demand or time with which to comply, was necessary to prevent a forfeiture of Smith's estate in the leasehold.

¶ 7 This action to quiet title was tried on August 2, 2001. Marshall Oil moved for a directed verdict that the trial court granted,

finding Smith's oil and gas leases expired by their own terms. The trial court denied Smith's Motion for New Trial and he appealed. The Court of Civil Appeals, Division I, affirmed the decision of the trial court in an opinion released for publication. On certiorari granted upon Smith's petition, we now vacate the Court of Civil Appeals' opinion, and sustain the judgment of the trial court, for the reasons set forth hereinbelow.

## STANDARD OF REVIEW

¶ 8 The instant matter is an action to cancel an oil and gas lease. As such, it is one of equitable cognizance. *Hininger v. Kaiser,* 1987 OK 26, 738 P.2d 137. The trial court's decision will not be reversed unless we find that it is clearly against the weight of the evidence. *Hamilton v. Amwar Petroleum Co.,* 1989 OK 15, 769 P.2d 146.

## IMPACT OF LANGUAGE IN HABENDUM CLAUSE

¶ 9 In the·state of Oklahoma, when the term "produced" is used in a "thereafter" provision of an habendum clause, its meaning is that of "production in paying quantities." *Stewart v. Amerada Hess Corp.,* 1979 OK 145, ¶ 5, 604 P.2d 854, 857; *Barby v. Singer,* 1982 OK 49, ¶ 4, 648 P.2d 14, 16; *Pack v. Santa Fe Minerals,* 1994 OK 23, ¶ 8, 869 P.2d 323, 326. "Production in paying quantities" is a term defined by Oklahoma case law to mean "production of quantities of oil and gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs or equipping costs are never recovered, and even if the undertaking as a whole may result in a loss to the lessee." *Hininger v. Kaiser,* 1987 OK 26, ¶ 6, 738 P.2d 137, 140. The phrase denotes a return in excess of "lifting expenses," costs associated with lifting the oil from the ground after the well has· been drilled. *Stewart v. Amerada Hess Corp.,* 1979 OK 145, ¶ 6, 604 P.2d 854, 857.[5] The record in this case establishes

---

4. A top lease is "an oil and gas lease to take effect only if the pre-existing lease should expire or be terminated." *Voiles v. Santa Fe Minerals, Inc.,* 1996 OK 13, ¶ 11, 911 P.2d 1205, 1207. The earlier leases are commonly referred to as

base leases. *Voiles,* 1996 OK 13, ¶ 12, 911 P.2d 1205, 1208.

5. "Lifting expenses" include but are not limited to the following: costs of pump operation, pump-

that during the secondary term of the Stacy–Paige lease, the subject wells ceased production at some times, while at other times, they produced, but not in paying quantities.

¶ 10 Smith, in his reply brief, contends that *Danne v. Texaco Exploration and Production, Inc.*, 1994 OK CIV APP 138, 883 P.2d 210, (holding Texaco forfeited its lease for breach of the implied covenant to market, during its secondary term,) controls the instant matter and should result in an opinion in his favor. We disagree. *Danne* is distinguishable on its facts as well as one of its legal theories—a claim that the lessee breached the implied covenant to market the product with due diligence. The instant matter is not a claim for breach of the implied covenant to market the product. It is a claim to quiet title under the theory that Smith's leases expired under their own terms, contained in the habendum clause. If the evidence herein demonstrates that the subject wells were not producing in paying quantities and that Smith failed to present compelling equitable considerations to justify this failure to produce in paying quantities, then a decree of lease cancellation may be rendered. *See, e.g., Pack v. Santa Fe Minerals*, 1994 OK 23, ¶ 9, 869 P.2d 323, 326–327, quoting *Stewart v. Amerada Hess Corp.*, 1979 OK 145, ¶ 12, 604 P.2d 854, 858.[6]

## EQUITABLE CONSIDERATIONS

¶ 11 We first conclude that the period employed by the trial court in the instant case, to measure the Stacy and Paige wells' profitability, was sufficient under all the facts and circumstances for a fair and reasonable de-

termination. Since the Stacy and Paige wells commenced in the primary terms of the subject leases, the question then becomes whether the period of cessation of production and of failure to produce in paying quantities is reasonable, as well as the question of Smith's diligence, as operator. Voluntariness of the cessation is another factor to consider. *Hunter v. Clarkson*, 1967 OK 114, ¶ 9, 428 P.2d 210, 212; *Kerr v. Hillenberg*, 1962 OK 160, ¶ 14, 373 P.2d 66, 69. The cessation of production herein was not due to mechanical difficulties, nor was it involuntary. By Smith's own testimony, he turned the wells on when he wanted to, and turned them off when he wanted to.[7]

■ ¶ 12 In determining whether a failure to produce in paying quantities suffices to terminate a lease, we examine the facts and circumstances of the cessation on a case-by-case basis. *Barby v. Singer*, 1982 OK 49, ¶ 6, 648 P.2d 14, 16–17; *Stewart v. Amerada Hess Corp.*, 1979 OK 145, ¶ 10, 604 P.2d 854, 858. Indeed, we have held that "compelling equitable considerations" may save a lease from termination even with unprofitable well operations. *Barby*, ¶ 7, 648 P.2d at 17 (prospect of impending federal legislation, The Natural Gas Policy Act, that might result in an increase in the price of natural gas was equitable consideration); *State ex rel. Commissioners of the Land Office v. Carter Oil Co. of West Virginia*, 1958 OK 289, ¶¶ 43–44, 54, 336 P.2d 1086, 1095–96 (an implied covenant case in which the fact that lessees were unable to market product due to absence of pipeline in which to transport product was equitable consideration); *Cotner v. Warren*,

---

er's salaries, costs of supervision, gross production taxes, royalties payable to the lessor, electricity, telephone repairs, depreciation, and other incidental lifting expenses. *Hininger v. Kaiser*, 1987 OK 26, ¶ 5, n. 4, 738 P.2d 137, 139, n. 4.

6. As we determined in *James Energy Company v. HCG Energy Corp.*, 1992 OK 117, 847 P.2d 333, two separate causes of action arise when it is claimed that a lessor violates an implied covenant to produce and market the product and when it is claimed that a lease expires under the terms of its habendum clause, for failure to produce in paying quantities. The former requires a demand that the lessee comply with the implied covenant, before a court of equity will grant a forfeiture, whereas the latter does not. Similar-

ly, in *Voiles v. Santa Fe Minerals, Inc.*, 1996 OK 13, 911 P.2d 1205, an action to quiet title in certain leasehold interests based upon the theory that a cessation of production clause controlled the habendum clause and terminated the base leases, we recognized the difference in an action filed by mineral owners to quiet title and cancel existing oil and gas leases, and a claim for breach of the implied covenant to market. In *Voiles*, we denied a party's request for remand to take testimony on a claim based upon breach of the implied covenant to market, because the issue was not raised previously.

7. Trial Transcript at p. 74, ll. 4–7., Smith testifying.

1958 OK 208, ¶¶ 8–9, 330 P.2d 217 (an implied covenant case wherein we held that five to six months of voluntary cessation of marketing where operator was attempting to resolve partnership differences during the time period was equitable consideration); *Hunter v. Clarkson,* 1967 OK 114, ¶ 10, 428 P.2d 210, 213 (an implied covenant case in which we held that a five month cessation of production and marketing without any circumstances to justify cessation was not equitable consideration and resulted in lease cancellation).

¶ 13 Smith relies heavily on our decision in *Pack v. Santa Fe Minerals,* 1994 OK 23, 869 P.2d 323. However, in the *Pack* case, the parties stipulated that the subject wells were at all times capable of producing in paying quantities. In the case at bar, Marshall Oil contends that the Stacy and Paige wells were not capable of producing in paying quantities in the condition they were in at the time immediately prior to the time Marshall Oil took possession and re-worked the wells. In the absence of compelling equitable considerations to justify Smith's failure to produce in paying quantities, the leases will terminate under the terms of the habendum clauses. The trial court concluded that a dearth of equitable considerations existed in the instant matter. On review, we must consider whether the trial court's conclusion is clearly against the weight of the evidence.

¶ 14 The evidence produced at trial establishes that the two leases in question failed to yield a return in excess of lifting expenses during years 1996 through 1998.[8] The evidence at trial supports a finding that the gross value of such production was approximately $12,383.27.[9] Evidence established Smith's lifting costs for this period were in excess of $52,355.00.[10] These lifting costs include saltwater disposal payments to landowner Scott, annual electric costs, gross pro-

duction taxes[11]; royalty payments to royalty owners and depreciation.[12] The leases took in revenue of approximately $9,495.77.

¶ 15 Smith testified at trial regarding this time period as follows: "I produced them when I felt like producing them. And I turned them off when I felt like turning them off."[13] This conduct is unacceptable for an operator in the state of Oklahoma, where the landowner is protected when an operator ceases production for an unreasonable time without cause, after the primary term expires. We stated in *Hunter v. Clarkson,* 1967 OK 114, ¶ 10, 428 P.2d 210, 213, that:

> "[t]he operator cannot … only produce oil when it suits his purposes. The landowner has an interest which must, and will, be protected when the operator ceases production for an unreasonable time, without cause, after the expiration of the primary term."

The facts in *Hunter* were disputed, but ultimately they revealed a voluntary cessation of production without any circumstances to justify a continuation of the lease.

¶ 16 The record supports the trial court's determination that while Smith produced these leases in their secondary terms, the production was not profitable for three years. At this juncture, all production ceased. No further production occurred until April 1999, when Marshall Oil's predecessor commenced operations under the new leases. Smith quit using electricity in January 1998. His production records reflect that he terminated production at this time. Smith offered no compelling equitable concerns to justify this. Instead, Smith testified he deliberately ceased production, hoping oil and gas prices would rise. However, he had no factual support for this, and testified it was his mere "hope."[14]

8. Plaintiff's Exhs. 17, 18 (cumulative production for years 1996–1999 was 740 barrels of oil and for years 1996 through March 1999, was 614 mcf of gas.)

9. Plaintiff's Exhs. 60–62, 70–75.

10. Plaintiff's Exhs. 125–183.

11. Plaintiff's exhs. 60–62 and 70–75

12. Plaintiff's Exh. 16.

13. Trial Transcript at p. 74, ll. 4–7, Smith testifying.

14. Trial Transcript at pp. 74–77, Smith testifying.

¶ 17 Smith also testified he did not want to produce the wells when prices of oil dropped to $8.00 a barrel, and that he decided to wait until they rose to $30.00 a barrel. However, the evidence presented shows that he sold oil for $16.25 per barrel on January 27, 1996, $22.50 a barrel on January 28, 1997, and $18.50 per barrel on February 28, 1997.[15] Fluctuating market prices do not rise to the level of an equitable consideration, or an excuse for Smith's failure to produce in paying quantities. While Smith contends that a gas purchase statement was addressed to him from Enerfin Resources One, L.P. for gas production dated February 2000,[16] this gas was produced by Marshall Oil's predecessor, not Smith. Marshall Oil's predecessor changed billing for the gas meters in January 1999, according to the evidence presented at trial. This was well over a year before this gas statement, making it a physical impossibility that Smith produced gas in February of 2000. Smith admitted this at trial.

¶ 18 The evidence supports the trial court's finding that no extenuating circumstances occurred that would justify Smith's failure to produce in paying quantities for these years, and that the leases expired by the terms of their own habendum clauses. Smith continues to argue that they were at all times capable of producing in paying quantities, thus satisfying the habendum clauses of the leases. The trier of fact found to the contrary, based upon the evidence presented at the trial of this matter and upon appellate review, we cannot say that this finding was contrary to the clear weight of the evidence. Smith failed to produce any evidence to support his assertion that the wells were at all times capable of producing in paying quantities, other than his personal belief to that effect. The record establishes that Smith's lifting expenses, which by his own admission understate his actual costs due to insufficient record-keeping, far exceed any return, when the wells actually were producing. Evidence as to how this scenario could change vis-à-vis a scenario in which the wells might be merely "capable of producing" was never presented by Smith. As stated

hereinabove, Smith's argument as to a breach of an implied duty to market is inapplicable to the instant facts. None of the cases cited by Smith involve the evidence in this case. He cannot, under the terms of his leases, only produce oil and/or gas when it suits his purposes. The lessors have an interest that must be protected when Smith, as operator, ceases production for an unreasonable time, without cause or justifiable equitable considerations, after the primary terms of the leases have expired.

¶ 19 The remaining issue before us concerns the addendum to the November 30, 1987, lease, to-wit: whether ownership of certain equipment left on the premises vested in the surface owner because Smith failed to remove it. The record indicates that Smith was primarily concerned with possession of the Stacy–Paige lease, as opposed to any specific equipment left on the premises. Plaintiff's/Appellant's trial Exhibit 16 purports to be at least a partial list of Smith's salvageable structures and equipment, along with the values associated with each item left on the premises, the ownership of which Marshall Oil contends vested in the surface owner. Smith apparently did not maintain an equipment inventory for this lease. The handwritten list does not contain a total value. If we accept the values assigned by Smith to the equipment he listed, the value is $70,202.00. We note that Smith wrote this list on the back of an Oklahoma Corporation Commission division order for interests in Hughes County, Oklahoma. In any event, it would appear that if he were concerned with ownership of his equipment vesting in the surface owner, he would have maintained an equipment inventory complete with values of equipment that could be substantiated with purchase and depreciation documentation. No such evidence is contained in the record before us.

¶ 20 Overall, Smith's testimony reflects a lack of concern as to equipment ownership vesting in the surface owner. He testified that he did not remember whether the provision in the November 30, 1987, lease regarding ownership of equipment vesting in

15. Plaintiff's Exhibits 60–62.

16. Plaintiff's Exh. 77.

the surface owner, was his idea or the lessors. He further testified it was agreed that if there were a cessation of production, he had six months to recover his equipment. There was no confusion as to this provision, or its application in the event of a cessation of production. The only dispute was as to whether a cessation of production actually occurred. Smith testified he did not agree that there was a fifteen month cessation of production, stating: "Because I had proved I had produced the wells up to December of '98."[17] The record supports a finding that Smith did not argue the provision providing equipment ownership would vest in the surface owner, if not removed within six months, was inapplicable. He merely argued that a cessation of production had not occurred. As such, our determination the Stacy–Paige lease ceased to produce in paying quantities indisputably triggered the six-month period for Smith to remove his equipment. His failure do so during the first calendar year of failure to produce in paying quantities, and the fact he left his equipment on the leased premises through calendar year 1999, when his successors in interest took over, supports a finding that ownership thereof vested in the surface owner, under this express lease provision.

¶ 21 Smith testified he did not realize the leases had changed hands until a potential buyer called him and said that there were "some people out there using your equipment and trying to produce your well."[18] Smith testified he "didn't do anything," even with this knowledge.[19] Instead of attempting to repossess his equipment, Smith did nothing. He sent an electric bill payment to Canadian Valley Electric, and received a phone call from them informing him the leases had been changed over to West Consultant. The record establishes that this occurred in January, 1999. It is difficult to comprehend how Smith could have been diligently reworking the subject wells or diligently attempting to produce them, while remaining completely unaware that another entity had entered the premises, had reworked or was in the process of reworking the wells and had changed over the electric billings.

¶ 22 The record reveals that Marshall Oil was prepared to offer testimony as to the significant amount of money spent to rework the wells and return them to the capacity to produce in paying quantities, once Smith's successors in interest took over. Counsel for Marshall Oil stated in his opening statement to the trial court that his client completely reworked the wells and installed new equipment, spending in excess of over half a million dollars in reworking and re-equipping the wells so that they would be able to produce in paying quantities. Since the trial court granted a directed verdict at the end of appellant's evidence, it was unnecessary for appellee to call its witnesses who by all accounts would have so testified. Nonetheless, this fact alone suggests that the equipment Smith left on the premises had little industry value. Otherwise, significant expenditures would not have been required, and Smith would have attempted to recover his equipment. The evidence in the record does not show any efforts by Smith to recover the equipment he left on the leased premises at the time his successors in interest took over the leases, or at any time prior or subsequent to that time. When asked what he would have to do to produce the wells if he were to take them over again, Smith testified he had "no idea;" that he "didn't know what Marshall Oil ha[d] done."[20] Evidence presented at trial established that while the wells were not producing under Smith's operation from 1996 forward, they began to produce again, after reworking by Marshall Oil's predecessors. This is evidenced in the February 2000 Gas Purchase Statement of Enerfin Resources[21], previously referenced in ¶ 17, hereinabove. Since substantial reworking

17. Trial transcript at. p. 57, ll. 8–9, Smith testifying.

18. Trial transcript at p. 50, ll. 18–23, Smith testifying.

19. Trial transcript at p. 50, l. 25, Smith testifying.

20. Trial transcript at p. 87, ll. 13–16, Smith testifying.

21. Plaintiff's Exh. 77.

was required, this lends credence to the belief that the value of Smith's equipment was nominal, at best. Both Smith's actions and inaction with regard to the equipment he left on the subject leases supports a determination that ownership vested in the surface owner, under the specific lease provision, but also that the equipment itself was of little or no value, vis-à-vis the subject leases. Smith did not testify as to the salvage value of his equipment. The testimony was inadequate to support a conclusion that Smith's equipment was valuable. In addition, Smith did not contend that inclement weather or any other condition or circumstance prevented him from removing his equipment during the allowed six-month period.

## CONCLUSION

¶ 23 Smith failed to present any equitable considerations to justify his failure to produce the Stacy–Paige lease, or to justify his failure to produce in paying quantities for the period of 1996–1998. In addition, Smith failed to produce any barrels of oil from the Stacy and Paige wells for the year 1999, and failed to present any equitable considerations to justify his failure to produce in 1999, as well. The evidence supports the trial court's rendering a directed verdict for Marshall. We hold that the evidence is sufficiently substantial to sustain the findings and determinations of the trial court, and to sustain its directed verdict in favor of Marshall Oil. We hold that the evidence did not constitute compelling equitable circumstances that would justify the continuation of the subject leases in the face of a cessation of production, and in the face of a cessation of production in paying quantities.

¶ 24 Smith failed to present any evidence at trial regarding inclement weather to preclude removal, or any other variable for equitable consideration, that might have precluded his removal of the structures, equipment and fixtures within the six months following cessation of production, as required under the Exhibit A to this lease. Therefore, we hold that the weight of the evidence clearly supports the judgment of the trial court in this regard. Since Smith failed to remove the structures, equipment and fixtures as

required under the November 30, 1987, addendum to the lease, ownership of same vested in the surface owner, under the specific provisions of the lease.

¶ 25 On certiorari granted upon Smith's petition, the Court of Civil Appeals' opinion is vacated; the judgment of the trial court is affirmed.

**CERTIORARI PREVIOUSLY GRANTED; THE OPINION OF THE COURT OF CIVIL APPEALS, DIVISION I, IS VACATED, THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED.**

CONCUR: WATT, C.J., OPALA, V.C.J., HODGES, LAVENDER, KAUGER, BOUDREAU, EDMONDSON, JJ.

NOT PARTICIPATING: HARGRAVE, J.

