2016 OK CIV APP 37

CONCORDE RESOURCES CORPORATION, Plaintiff/Appellee,

v.

WILLIAMS PRODUCTION MID–CONTINENT COMPANY, Mahalo Energy (USA), Inc., now Redbud E & P, Inc., Defendants/Appellants,

Kepco Energy, Inc., Pyle, Carey and Collie, Inc., Smith, Smith and Smith, a general partnership, and Nancy Jackson Dawson, Defendants/Appellees.

Case No. 112,340

Court of Civil Appeals of Oklahoma, DIVISION IV.

Filed: 11/24/2015

Mandate Issued: 06/27/2016

Donald W. Henson, Okmulgee, Oklahoma, for Plaintiff/Appellee.

Gregory L. Mahaffey, Travis P. Brown, Brady L. Smith, Mahaffey & Gore, P.C., Oklahoma City, Oklahoma, for Defendant/Appellant Mahalo Energy (USA), Inc., now Redbud E & P, Inc.

OPINION BY KEITH RAPP,
PRESIDING JUDGE:

¶1 The defendant, Redbud E & P, Inc. (Redbud), appeals a judgment in favor of the plaintiff, Concorde Resources Corporation (Concorde), quieting title in Concorde as to certain oil and gas leases.[1]

¶2 The defendants, Kepco Energy, Inc. (Kepco); Pyle, Carey and Collie, Inc. (PCC); Smith, Smith and Smith, a general partnership (Smith); and Nancy Jackson Dawson (Dawson) did not appear at trial and they

have not appeared in this appeal. The trial court judgment, as it pertains to these defendants is final.

¶3 In addition, the trial court found in favor of Redbud and Kepco as to Concorde's claims of interference with business relationships and malicious pursuit of quiet title. This ruling has not been appealed and is final.

## BACKGROUND

¶4 In 1978, Gary A. Callahan acquired oil and gas leases from PCC, Smith and Dawson, or their predecessors, covering the SW/4 and the N/2 SE/4 and SW/4 SE/4 and NW/4 Section 12, T9N, R15E, McIntosh County, Oklahoma. The parties refer to these as the Callahan Leases or Original Leases.

¶5 A gas well was drilled in 1981 to the Booch formation by Concorde's predecessor. The well was shut-in in 1982. The well was renamed the Connors #1. Concorde's owner testified that Concorde acquired the Original Leases.[2] Concorde has paid shut-in royalty payments at all relevant times, although apparently limited to the SW/4.

¶6 In 1990, Concorde acquired new oil and gas leases from PCC, Smith and Dawson, or their predecessors in title (New Leases).[3] These leases described only the SW/4 Section 12, T9N, R15E, McIntosh County, Oklahoma. The owner of Concorde testified that the reason for the New Leases was to reduce the spacing and reduce the shut-in payment. On cross-examination, he affirmed Concorde's position that the Connor #1 has been capable of production in paying quantities since it was drilled and completed in 1982. He continued and agreed that the circumstance would serve to hold the Callahan Leases (Original Leases).[4]

---

1. The Journal Entry recites that Redbud was formerly Mahalo Energy (USA), Inc. (Mahalo) and that Redbud is the successor in interest to Williams Production Mid–Continent Company (Williams) and Mid–Continent Company (Mid–Continent).

2. The owner testified that the Original Leases were acquired in settlement of litigation. Tr. pp. 30–31. The Record does not reflect any formal assignment filed showing a transfer of the Original Leases and the Concorde owner did not recall any formal assignment. He did file a

change of operator with the Oklahoma Corporation Commission. Tr. p. 31.

3. This Opinion will use "New Leases" to refer to the leases acquired by Concorde in 1990 and "Original Leases" for the Callahan leases that Concorde acquired prior to 1990.

4. Redbud cites this testimony along with its pooling order from OCC to assert leased ownership of pooled formations Savanna, Red Fork, Bartlesville and Hartshorne under Section 12, T9N,

¶ 7 The first issue now is whether the Original Leases and New Leases terminated because of the inability of the Connors #1 well to produce in paying quantities when it was "turned on" in July of 2008. The second issue for determination is whether Redbud and its predecessors acquired the Old Leases as to the Formations as a result of the OCC pooling order.

¶ 8 The history of Connor #1, shows that Concorde deepened the well in 1990 to the Middle Booch formation, without success. From that time to 2008, Concorde did not perform any other activities in connection with the well other than checking well pressure, usually twice a year, and the pressure reading was between 380 and 440 pounds. Concorde did not expend funds during that time period for operation or maintenance of the well.[5] From 1990 to July of 2008, Concorde did not sell any gas from Connor #1. Also, Concorde did no further exploration. Concorde does not dispute this inactivity.

¶ 9 Without contradiction, Concorde maintained that there was no pipeline connection available until July 2008, and the trial court found that to be true. The parties stipulated that Redbud would not assert breach of the implied covenant to market.

¶ 10 A pipeline became available in 2008. Concorde's owner testified that Concorde connected to the pipeline in July 2008, tested the line and waited for a gas sales contract. According to the witness, the well was turned on without any problem, such as water or any need for repairs, and gas was sold.

¶ 11 A compressor was added. According to Concorde's witness, this equipment aided in transportation of the gas in the pipeline and had no function for production. Dating from about 1990, the well had a water tank and separator. Concorde replaced both in June 2008.[6] According to Concorde's owner, the well was "turned on" and began producing gas. The well was not "loaded" with water and the water produced was consistent with water produced generally in gas production. Concorde's records reflect 110 barrels of water during the first approximately 30 days of production in 2008. Redbud maintains that this is excessive and shows that the well was "loaded" with water. The trial court found that the water removal did not equate to adding additional equipment or repair.

¶ 12 Concorde presented Mr. Davis, the person who assisted with the 1990 deepening of the well. He was qualified as a person having drilled many wells and as a former employee of the Oklahoma Corporation Commission (OCC). Mr. Davis explained that water was used in the drilling to deepen the well and then the well was dried. He confirmed the regulatory method for testing pressure and testified that the well was then testing for about 400 pounds and estimated it was capable of producing substantial volumes of gas. On unspecified future dates, he again checked and there was pressure at the wellhead. In his opinion the well was capable of producing gas in paying quantities when it was shut-in.[7] Mr. Davis testified that the compressor functioned for transportation rather than production.

¶ 13 On cross-examination, Mr. Davis agreed that he did not know the capability of the well in 2008. He also stated that without a separator, the gas purchaser would not purchase the gas with water content.

R15E, McIntosh County, Oklahoma, as the common source of supply ("Formations.") The Oklahoma Corporation Commission pooling order, covering those formations, is in evidence as Def. Ex. 53. The pooling order shows that Concorde was a party to the proceeding and its application. Redbud agreed that the Oklahoma Corporation Commission pooling order did not cover the Booch formation. Tr. p. 189.

5. The parties differed about the meaning and significance of the pressure readings, and in particular regarding the existence of water in the well and its implications for pressure readings.

6. The trial court ruled that it would be foolish to purchase or rent a compressor, separator, and salt water tank when there was no pipeline available to sell the gas because they would just deteriorate.

7. Concorde's expert witness previous to Mr. Davis testified principally about whether Redbud's predecessors had been in bad faith. However, he also defined "Shut-in." Tr. p. 118.

   In order to have a shut-in gas well, two requirements are the well has to be capable of producing gas in commercial quantities, and second, you have to—there has to be no available market.

¶ 14 Concorde's vice-president, Mr. Dobbs, testified about checking the well over time.[8] It always had pressure of approximately 390 pounds. He presented the financial history of the well showing gas sales and the net after taxes and costs, including depreciation. He also agreed that the Connor #1 well would hold the Old Leases, assuming production capability. On redirect, he testified that Redbud's pooling order did not cover the formation being produced by Connor #1.

¶ 15 Concorde sold gas from the well in July, August and September of 2008 and received $24,000.00. Concorde resumed operation of the well after the first appeal in this case and the well has produced since then.[9]

¶ 16 In 2006 and 2007, Redbud, or its predecessors, obtained oil and gas leases, which in combination covered the SW/4 and NW/4 and E/2 SE/4 and NE/4 SE/4 Section 12, T9N, R15E, McIntosh County, Oklahoma (Redbud Leases).[10] Concorde learned of this and proposed drilling and sent a letter demanding a release of the leases by Redbud's predecessor as to the SW/4 of Section 12, T9N, R15E, McIntosh County, Oklahoma.

¶ 17 The refusal to release resulted in this lawsuit by Concorde to quiet title and to obtain damages against Kepco, Williams and Mahalo. The trial court ruled against the damages claims and Redbud did not appeal that ruling. Kepco, Williams and Mahalo (all now Redbud) counterclaimed to adjudicate Concorde's leases as expired and to quiet their respective titles. Kepco did not appear for trial.

¶ 18 Redbud maintained first that the Original Leases and the New Leases expired because Concorde has not shown that the only existing well was capable of producing in paying quantities. Redbud presented an expert petroleum engineer who testified that his opinion was that the Connor #1 was not capable of production in paying quantities in 2008.

¶ 19 The expert testified that he examined records showing that the well was operational for a short time in mid-June 2008 and not operational again until late-July 2008. He inferred that work had to be performed on the well in order to make it productive. This work mainly involved replacement of the separator and compressor. The witness testified that these items were necessary in order for the well to be capable of commercial production. He characterized the compressor expense as a lifting cost and stated that it aided in removing water during the period from June to July so that the well would be productive. In his opinion, the 110 barrels of water produced in the first two months confirmed water accumulation over time while the well was shut-in. He summarized his opinion to say that the well was turned on in June 2008, it did not produce due to water, additional or new equipment had to be obtained and installed, the water was pumped out using the compressor, and the well became productive.[11]

¶ 20 On cross-examination, the expert acknowledged that he had not visited the Connor #1 well site. He also had no evidence of what transpired at the well during June to July 2008, and deduced his conclusion from invoices to Concorde. He agreed that the well has been producing in paying quantities since July 23, 2008, but maintained that the relevant date to consider was the date the well was "turned on" and, in his opinion, the well

8. Counsel for Redbud, on cross-examination, propounded questions designed to impeach the witness. Objections were made. Redbud's Brief references the subject matter of the questions. However, it appears that the trial court struck the impeachment testimony. Tr. p. 169.

9. The witness testified that the well was shut-in during the pendency of the first appeal in this case. After the mandate issued, Concorde resumed production and sale of gas, but with the proceeds in suspense pending the outcome of this case.

10. The Original Leases, in combination, and the Redbud Leases, in combination, all described the same lands, which included the SW/4 Section 12, T9N, R12E, McIntosh County, Oklahoma, along with other lands. The New Leases described only the SW/4 Section 12, T9N, R12E, McIntosh County, Oklahoma. Connor #1 is located in that SW/4.

11. Tr., p. 205.

was not capable of producing in paying quantities on that date.

¶ 21 Redbud's final witness was an attorney, an expert in title examination. He testified that Concorde's taking of the New Leases was consistent with a conclusion that Concorde did not consider the Original Leases any longer valid. He also agreed that the OCC pooling order did not pool the Connor #1 well.

¶ 22 The trial court held in favor of Concorde with regard to the lease issues and denied damages. Redbud appeals.

## STANDARD OF REVIEW

¶ 23 In actions of equitable cognizance, the judgment made by the trial court will be reversed if it is clearly contrary to the weight of the evidence or contrary to accepted principles of equity or rules of law. *In re Estate of Eversole*, 1994 OK 114, ¶ 7, 885 P.2d 657, 661. *Hitt v. Hitt*, 1953 OK 391, 258 P.2d 599, held that it is for the trial court in a case of equitable cognizance to determine the credibility of the witnesses and the weight and value to be given to the testimony. Where the evidence is in conflict, the trial court's determination will not be set aside unless the determination is clearly against the weight of the evidence. *Briggs v. Sarkey's Inc.*, 1966 OK 168, ¶ 29, 418 P.2d 620, 624.

¶ 24 The appellate court will exercise its "plenary, independent, and non-deferential authority [when] reexamin[ing] a trial court's legal rulings." *Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125, ¶ 4, 932 P.2d 1100, 1103 n.1; *Spielmann v. Hayes*, 2000 OK CIV APP 44, ¶ 8, 3 P.3d 711, 713. This Court's standard of review is *de novo* and gives no deference to the legal rulings of the trial court. *State ex rel. Dept. of Human Services, ex rel. Jones v. Baggett*, 1999 OK 68, 990 P.2d 235.

## ANALYSIS AND REVIEW

### A. Relationship of Original Leases and New Leases

¶ 25 The trial court quieted title in Concorde "in and to the oil and gas leases" without specific description. The ruling continued further and validated the New Leases.

¶ 26 According to the only evidence in the case, Concorde acquired the Original Leases, including the Connor #1, in a settlement of litigation. However, the assignment was not recorded either as a documented settlement or an official deed record.[12] The prior owner did file with the OCC a change of operators notice. Subsequently, Concorde obtained the New Leases covering only the SW/4, and these were duly recorded.

¶ 27 However, Concorde's witnesses agreed that the Connor #1 held the Original Leases.[13] Without more, the status of the New Leases would be questionable. Therefore, it is necessary to reconcile the ruling quieting title and the ruling validating the New Leases.

¶ 28 The reconciliation begins with the recognition that the trial court necessarily ruled that Connor #1 also held the New Leases notwithstanding that the Connor #1 was completed before Concorde obtained the Original Leases from Callahan and the New Leases. A trial court judgment in an equity case carries with it all necessary findings and conclusions. *First Federal Savings and Loan Ass'n, Chickasha, Oklahoma v. Nath*, 1992 OK 129, 839 P.2d 1336 (implied finding of no injury to plaintiff seeking an injunction); *O'Laughlin v. City of Ft. Gibson*, 1964 OK 31, 389 P.2d 506 (Syl. 1).

¶ 29 However, in order to sustain the conclusion that Connor #1 holds the New Leases, there must be a legal connection between that well and the New Leases. The steps to reach this conclusion are: (1) Concorde acquires Original Leases; (2) Concorde acquires New Leases: (3) the merger doctrine operates to merge the common title; and (4) Connor #1 is a well capable of producing in

---

12. As between Concorde and its then opponent, no recording was necessary. 16 O.S.2011, § 15. Moreover, as to leases of lands other than the SW/4, Redbud made no claim of being a bona fide purchaser without notice, leaving only the SW/4 at issue.

13. The prior appeal in this case did not decide whether Connor #1 would also hold the New Leases due to the absence of factual development and provision of legal authority.

paying quantities.[14]

¶ 30 This Court finds that Concorde held equitable title to the Original Leases as a result of the litigation settlement. Equity treats things agreed to be done as actually performed. *Hamra v. Mitchell*, 1928 OK 557, 133 Okla. 264, 271 P. 1042. Concorde settled its case and pursuant to the terms shown by the only evidence here, Concorde obtained equitable title to the Original Leases. That was the status when Concorde obtained the New Leases, so that Concorde then owned equitable title to the Original Leases with Connor #1 and legal title to the New Leases, with the common title being the SW/4.

¶ 31 The necessary conclusion here is that the titles to the Original Leases and New Leases merged as to the SW/4. When a legal estate and an equitable estate are coextensive and become vested in the same person, there is a merger of the equitable estate in the legal estate and a consequent extinguishment of the equitable estate, and survival of the legal estate, absent any intent not to merge. *First Federal Savings and Loan Ass'n, Chickasha, Oklahoma*, 1992 OK 129, ¶ 5, 839 P.2d at 1340.

¶ 32 The evidence shows that Concorde obtained the New Leases for its benefit. Shut-in royalty was paid based on the New Leases as well as the Original Leases. There is no evidence that Concorde abandoned the Connor #1 or drilled a new well as a result of the New Leases acquisitions. The evidence shows that Concorde treated the New Leases as covered by the Old Leases and Connor #1.

¶ 33 Therefore, this Court finds that the Original Leases, together with the legal and factual consequences associated with Connor #1, merged with the New Leases as to the SW/4. The first three steps are satisfied and the next question then is whether Connor #1 was capable of producing in paying quantities so as to hold the Leases.

### B.1. Whether The Connor #1 Was Capable of Production in Paying Quantities.

¶ 34 In order to avoid lease expiration under the facts here, the Connor #1 well must have been capable of producing gas in paying quantities. The terms "produced" and "produced in paying quantities" have substantially the same meaning. *Pack v. Santa Fe Minerals*, 1994 OK 23, ¶ 8, 869 P.2d 323, 326. The meaning of that phrase is set out in *Smith v. Marshall Oil Corp.*, 2004 OK 10, ¶ 9, 85 P.3d 830, 833.

> In the state of Oklahoma, when the term "produced" is used in a "thereafter" provision of an habendum clause, its meaning is that of "production in paying quantities." ... "Production in paying quantities" is a term defined by Oklahoma case law to mean "production of quantities of oil and gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs or equipping costs are never recovered, and even if the undertaking as a whole may result in a loss to the lessee." ... The phrase denotes a return in excess of "lifting expenses," costs associated with lifting the oil from the ground after the well has been drilled (citations omitted).

¶ 35 Here it is clear that Connor #1 produces gas in paying quantities. The contested issue in this case is whether the well had the ability to produce when the market became available in June 2008, rather than the actual production at a later time. *Pack*, 1994 OK 23, ¶ 10, 869 P.2d at 327.

¶ 36 *Pack* presented a marketing issue regarding wells that were capable of producing in paying quantities. The Court construed *Smith* in *Baytide Petroleum, Inc. v. Continental Resources, Inc.*, 2010 OK 6, ¶ 16, 231 P.3d 1144, 1149. ("*Smith's* pronouncement makes it clear that it is the unreasonable cessation of production that causes the lease to terminate.") The issue in *Smith* involved a question of whether wells produced in paying quantities. There, the Court held:

> In determining whether a failure to produce in paying quantities suffices to terminate a lease, we examine the facts and circumstances of the cessation on a case-by-case basis. Indeed, we have held that "compelling equitable considerations" may

---

14. Shut-in royalties have been paid.

save a lease from termination even with unprofitable well operations.

*Smith*, 2004 OK 10, ¶ 12, 85 P.3d at 83 (no equitable considerations given) (citations omitted).

¶ 37 In the case under review, the question does not arise because of some intervening equitable consideration excusing delay in production. Shut-in royalties were paid over the years and the evidence shows that there was no ability to market the gas from the well until 2008. Here, the question is whether the Connor #1 had the *ability* to produce in paying quantities when the impediment (no pipeline) to marketing was removed.[15]

¶ 38 Redbud argues for a test that would consider only whether the well could be merely "turned on" when the pipeline became available. Redbud's view of the evidence is that Connor #1 required repair and additional equipment before it could be "turned on" and begin flowing gas. Redbud relies on secondary authority from *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 433–34 (Tex. App. 1993), where the Court stated:

> We believe that the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

¶ 39 Concorde, of course, has the opposite view and maintains that the well was "turned on" and produced. According to Concorde, the replaced equipment did not affect the well's ability to produce, but was required for marketing and transportation, because the buyer would not accept product with water.

¶ 40 Redbud again cites a secondary source which is not binding on this Court.

*See Coronado Oil Co. v. U.S. Dep't of Interior*, 415 F.Supp.2d 1339 (D. Wyo. 2006). Coronado produced oil with some water, but over time the water increased substantially to 99.8 percent water. The well ceased production while Coronado sought form the State a permit to discharge the water. After attempts to restore production and a series of exchanges with the U.S. Bureau of Land Management (BLM), BLM notified Coronado that the lease was terminated. Coronado maintained that BLM violated the Mineral Leasing Act, 30 U.S.C. § 226(i) which barred termination where "there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same unless the lessee is allowed a reasonable time, which shall be not less than sixty days after notice by registered or certified mail, within which to place such well in producing status."

¶ 41 In the context of an argument over notice, the court stated:

> A "well capable of production in paying quantities" must be presently able to produce oil or gas-potential for production is insufficient. Therefore, a well is not capable of production in paying quantities "where substantial pumping of water from the well is required before oil could be produced in paying quantities."

*Coronado*, 415 F.Supp.2d at 1351–52 (citations omitted).

¶ 42 The *Coronado* facts were that water was virtually all that was produced. Moreover, there was no evidence to show that the well was capable of production before the water was pumped out. Such evidence was necessary under the regulations in order to have a hearing on the well's capability of immediate production. Nevertheless, the court reversed the BLM and required it to consider whether Coronado was acting with due diligence to rework the well as it was permitted to do.

---

**15.** This Court notes that here the parties focus on the period of mid-June to late July 2008. The New Lease anniversary date precedes that period and the anniversary date is the date for payment of shut-in royalty to cover a one-year period. The parties have not presented or briefed the question of whether the payment of shut-in royalty on the anniversary date of the New Leases had any role in determining the "ability to produce date," that is, whether the "ability to produce date" would be postponed to the next anniversary. This Court expresses no views on the issue.

¶ 43 Here, the parties disputed the effect of the water produced in Connor #1. Moreover, under any view of the evidence, the water issue was not as severe in *Coronado* as evidenced by the purchase of product in the pipeline. The trial court found in favor of Concorde on the disputed facts.

¶ 44 In reaching its conclusions, the trial court did not take either party's contention completely as its own. Rather, the trial court acknowledged that equipment was replaced and that work was done regarding water. However, the trial court added that "it would be foolish" to purchase the separator and compressor only to have them deteriorate while waiting for a market for the gas and the work was not of a nature to render the well incapable of production. In other words, the trial court applied equitable and rational considerations to the facts in order to reach its decision.

¶ 45 The trial court's reasoning and result regarding whether Connor #1 was capable of producing in paying quantities in June 2008 are correct. The literal application of the secondary authority of *Hydrocarbon Management, Inc.* is contrary to Oklahoma jurisprudence as well as that of other jurisdictions.

■ ¶ 46 In *Levin v. Maw Oil & Gas, LLC*, 290 Kan. 928,234 P.3d 805 (2010), the issue involved a definition of "shut-in" where one component of the definition is that the well must be capable of producing in paying quantities.[16] The Kansas Court rejected *Hydrocarbon Management, Inc.* as being too rigid. The Kansas Court looked to the matters that affected the properties and potential of the well as opposed to factors related to processing or transport of the product. In doing so, the Kansas Supreme Court ruled:

> The setup and performance of dewatering operations may affect a well's completeness, but we decline the lessors' invitation to adopt a rigid legal definition of shut-in entirely dependent upon whether dewater-

ing has begun or upon whether equipment or repairs are still needed.

*Levin,* 234 P.3d at 819.

¶ 47 In addition, Redbud points to the total absence of production of any sort for seventeen years, together with its assessment of the physical condition of the equipment and well pressure. Redbud argues that the well required work and additional equipment before it could be made productive and that the trial court erred in finding otherwise.

¶ 48 Concorde disputes Redbud's characterization of the physical condition of the well equipment and maintains that the well did in fact have sufficient pressure. Concorde argues that the compressor was added for transportation purpose and not for production purpose. Concorde's owner testified that the well was turned on and began producing. According to him the well was not "loaded" with water and such water that was produced was a natural condition associated with gas production.

¶ 49 *Smith* instructs that a review examines the facts and circumstances of the cessation on a case-by-case basis and that "compelling equitable considerations" may save a lease from termination even with unprofitable well operations. The resolution of the disputed facts was a task for the trial court. Redbud would have the trial court cancel all the Leases based upon its argument that at an instant in time when water contamination was not allowed in the pipeline, the Connor #1 was not capable of producing in paying quantities. The cases of *Smith* and *Levin* reject that approach in favor of equitable considerations in a case-by-case review.

■ ¶ 50 Although disputed, the evidence at worst for Concorde showed that when the well was "turned on" Concorde experienced a temporary, easily corrected impediment to production. The impediment was promptly rectified.[17] Concorde installed equipment (which it maintained was unrelated to production) and, as all agree, Connor #1 has

---

16. A well is "shut-in," for purposes of a shut-in royalty clause in an oil and gas lease, when it is completed and capable of producing natural gas in paying quantities. *Levin,* 234 P.3d at 816–17.

17. In *Coronado,* the operator was given an opportunity to remedy the problem with the water.

produced gas in paying quantities since July–August 2008.

¶ 51 According to the trial court, installation of that equipment would be "foolish" without a pipeline. Redbud does not dispute the characterization in its argument for capability at a specific moment in time. Clearly, here the trial court found expenditures characterized as "foolish" to be a compelling consideration. The trial court's reasoning and conclusion are not against the clear weight of the evidence.

¶ 52 Given the "foolish" aspect, it follows that an equitable consideration will allow a reasonable time to test and repair or replace equipment after so long a period as here.[18] Implicit in the trial court's judgment is the conclusion that Concorde had a reasonable time to test and make repairs and that the time involved was not unreasonable.

¶ 53 Therefore, this Court holds that a determination of whether a well is "capable of producing in paying quantities" involves equitable considerations conducted on a case-by-case basis. Looking at the status of a well at a precise moment in time might overlook rational explanations of whether a well is, or is not, capable of producing in paying quantities. Here, it is clear that the trial court, expressly or implicitly, examined the facts pertinent to Connor #1 in accordance with the foregoing criterion.

¶ 54 The trial court's conclusion that Connor #1 is a well capable of producing in paying quantities is not against the clear weight of the evidence or contrary to law. However, this does not resolve Redbud's claim to other formations.

**B.2. Lease Ownership as to Savanna, Red Fork, Bartlesville and Hartshorne Formations ("Formations").**

¶ 55 The trial court quieted title "in and to the oil and gas leases" in Concorde, but without mentioning whether that included the Original Leases, the New Leases, or both. The trial court's ruling continued and validated the New Leases.[19] Redbud asserts lease ownership as to the other Formations by virtue pooling of the Original Leases (also called Callahan Leases in the Briefs) in the OCC Pooling Order 548316, dated December 28, 2007.[20] Redbud does not claim any rights to Connor #1 or the Booch formation based upon the pooling order. Concorde was a party and respondent in the OCC proceeding.

¶ 56 The trial court overruled Concorde's procedural objections to consideration of the question, and Concorde has not appealed. Therefore those objections will not be considered.

¶ 57 Concorde's remaining argument appears to be that: (1) the Original Leases had expired; (2) thus, the Original Leases could not be pooled; and, (3) therefore, Concorde's New Leases define its interest and ownership of Connor #1, unaffected by the pooling order. The first premise is not supported by Concorde's own witnesses, and does not appear to have been an issue in the pooling proceeding. More important is the fact that Redbud makes no claim to the Connor #1 and its Booch formation by virtue of the pooling order.

¶ 58 The trial court's order that quieted title "in and to the oil and gas leases" must be modified. The judgment is modified to grant judgment to Concorde quieting title in and to the Original Leases and the New Leases insofar as they cover the formations under the SW/4 Section 12, T9N, R15E, McIntosh County, Oklahoma, other than Savanna, Red Fork, Hartshorne and Bartlesville formations. The cause is remanded to the trial court for the purpose of entering the modified judgment and supplying such precision of legal description as is appropriate.

## CONCLUSION

¶ 59 Oil and gas leases were obtained in 1978 covering the SW/4 and other tracts in

---

18. This Court notes that adoption of Concorde's view of the function of the compressor and separator as transportation related makes it possible that the depreciation of these items would not be deducted from proceeds to calculate lifting costs and then "paying quantities." *See Mason v. Ladd Petroleum*, 1981 OK 73, 630 P.2d 1283.

19. Journal Entry, ¶ 10.

20. Def. Ex 53. The pooling order covers the Formations in all of Section 12, T9N R15E McIntosh County, Oklahoma.

Section 12, T9N, R15E, McIntosh County, Oklahoma. A gas well was drilled in the SW/4 and shut-in for lack of a pipeline. Concorde acquired equitable title to these leases and, afterward, obtained leases covering only the SW/4. Pursuant to the merger doctrine, Concorde's equitable title and legal title as to the SW/4 merged.

¶ 60 The trial court's decision that the Connor #1 well was capable of producing in paying quantities when a pipeline became available is not against the clear weight of the evidence or contrary to law. That part of the judgment is affirmed.

¶ 61 By virtue of a pooling order, Redbud acquired the interests under all of Section 12, T9N, R15E, McIntosh County, Oklahoma, as to the Savanna, Red Fork, Hartshorne and Bartlesville formations. The trial court's judgment quieting title in Concorde is modified to exclude those formations. The cause is remanded for the purpose of modification of the judgment with the precise legal description supplied as part of the judgment in accord with this Opinion.

¶ 62 **AFFIRMED IN PART AND MODIFIED IN PART AND REMANDED WITH INSTRUCTIONS.**

BARNES, J., and THORNBRUGH, J., concur.